PROVIDENCE/BRISTOL COUNTY SUPERIOR COURT

# SC DOCKET SHEET
## CASE NO. PC-2026-02753

| | | |
|---|---|---|
| THE STATE OF RHODE ISLAND by and through ATTORNEY GENERAL PETER F. NERONHA<br>v.<br>KALSHIEX LLC et al. | § § § § | Location: **Providence/Bristol County Superior Court**<br>Filed on: **05/21/2026** |

---

### CASE INFORMATION

Case Type: **Civil Action**

Case Status: **05/21/2026   Unassigned**

---

| DATE | CASE ASSIGNMENT |
|---|---|
| | **Current Case Assignment**<br>Case Number    PC-2026-02753<br>Court    Providence/Bristol County Superior Court<br>Date Assigned    05/21/2026 |

---

### PARTY INFORMATION

| | | Lead Attorneys |
|---|---|---|
| Plaintiff | **THE STATE OF RHODE ISLAND by and through ATTORNEY GENERAL PETER F. NERONHA** | Meosky, Paul Timothy James<br>*Retained*<br>716-949-5106(W) |
| Defendant | **KALSHIEX LLC** | |
| | **QCX, LLC d/b/a POLYMARKET US** | **PARKER, MATTHEW HAYES**<br>*Retained*<br>4012704500 x000(W) |

---

| DATE | EVENTS & ORDERS OF THE COURT |
|---|---|
| | ## EVENTS |
| 05/22/2026 | 📄 Notice of Removal<br>*Notice of Filing Notice of Removal of Civil Action to the U.S. District Court for the District of Rhode Island* |
| 05/22/2026 | 📄 Summons |
| 05/21/2026 | 📄 Complaint Filed<br>*Petition for Declaratory Judgment* |



## STATE OF RHODE ISLAND
## AND PROVIDENCE PLANTATIONS

### CLERK'S CERTIFICATE AND TRANSMITTAL OF THE RECORD

**Case Information**

Case Caption: __The State of RI__ vs. __Kalshiex LLC et al__

Federal Court Case No. __1:26-cv-00333__   State Court Case No. __PC-2026-02753__

**Record Information**

Confidential:   Yes ☐   No ☑   Description: _____

Sealed documents:   Yes ☐   No ☑   Description: _____

**Certification**

I, __Alexa Goneconte__, Clerk of the Rhode Island Superior Court for the County of __Providence__ do certify that the attached documents are all the documents included in the record in the above referenced case.

Date: 05/27/2026

Clerk of Court
/s/ __Alexa Goneconte__
By Deputy Clerk

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

**STATE OF RHODE ISLAND SUPERIOR COURT PROVIDENCE COUNTY**

THE STATE OF RHODE ISLAND by and through ATTORNEY GENERAL PETER F. NERONHA,

        *Plaintiff*,

            v.

KALSHIEX LLC;
QCX LLC d/b/a POLYMARKET US,

        *Defendants*.

Superior Court for the State of Rhode Island, Providence County, Case No. PC-2026-2753

**NOTICE OF FILING NOTICE OF REMOVAL OF CIVIL ACTION TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

Please take notice that on May 22, 2026, Defendant QCX LLC d/b/a POLYMARKET US, with the consent of Defendant KALSHIEX LLC, filed in the United States District Court for the District of Rhode Island a Notice of Removal in accordance with 28 U.S.C. §§ 1331, 1441(a), 1442(a), and 1446.

A true and correct copy of the Notice of Removal is attached hereto as Exhibit 1. The Providence County Superior Court of the State of Rhode Island is hereby requested to proceed no further with this matter unless the case is remanded.

1

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

Dated: May 22, 2026

Respectfully submitted,

*/s/ Matthew H. Parker*

WHELAN CORRENTE & FLANDERS LLP

Matthew H. Parker (#8111)
100 Westminster Street, Suite 710
Providence, RI 02903
Telephone: 401.270.4500
Fax: 401.270.3760
mparker@whelancorrente.com

Orin Snyder*
Matt Benjamin*
Amanda LeSavage*
GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene*
GIBSON DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

*Applications for pro hac vice forthcoming*

*Attorneys for Defendant QCX LLC d/b/a
Polymarket US*

2

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

## CERTIFICATION OF SERVICE

I hereby certify that on the 22nd day of May 2026, I filed and served this document through the electronic filing system upon the following:

Peter Neronha
Attorney General of Rhode Island
Patrick J. Dolan
Paul T.J. Meosky
Michael B. Collins
Special Assistant Attorneys General
150 South Main Street
Providence, RI 02903
Telephone: 401.274.4400
pdolan@riag.ri.gov
pmeosky@riag.ri.gov
mcollins@riag.ri.gov

The document electronically filed and served is available for viewing and/or downloading from the Rhode Island Judiciary's Electronic Filing System.

*/s/ Matthew H. Parker*

3

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

<table>
<tr><td>

THE STATE OF RHODE ISLAND by and through ATTORNEY GENERAL PETER F. NERONHA,

    *Plaintiff*,

       v.

KALSHIEX LLC.; QCX LLC d/b/a POLYMARKET US,

    *Defendants*.

</td><td>

Case No.: _____

Superior Court for the State of Rhode Island, Providence County, Case No. PC-2026-2753

NOTICE OF REMOVAL TO FEDERAL COURT

</td></tr>
</table>

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1331, 1441(a), 1442(a) and 1446, Defendant QCX LLC d/b/a Polymarket US ("Polymarket US"), by and through its attorneys, hereby removes the above-captioned action from the Providence County Superior Court to the United States District Court of Rhode Island. KalshiEX LLC consents to this removal. *See* Exhibit 1.

This Notice of Removal is not intended to constitute and should not be construed as constituting the general appearance or appearance on the merits of Defendants in this matter. By filing this Notice of Removal, Defendants do not waive any defenses they have to this action whether in state or federal court, including, but not limited to, improper service of process and/or lack of personal jurisdiction. Polymarket US reserves the right to amend or supplement this Notice of Removal.

In support of removal, Polymarket US states as follows:

### BACKGROUND

1. Prediction markets, exchanges that trade a kind of derivative financial instrument known as event contracts, are an important component of modern, federally regulated financial markets. Hundreds of thousands of U.S. consumers—and millions worldwide—rely on these

1

markets to obtain real-time, accurate information about consequential events in politics, finance, technology, news, and sports.  Through the Commodity Exchange Act ("CEA"), Congress placed these markets squarely within a comprehensive federal regulatory regime and vested exclusive supervisory authority in the Commodity Futures Trading Commission ("CFTC").

2.     Polymarket US operates a federally licensed designated contract market that offers event contracts.  Event contracts are a type of "swap," a financial contract where two parties agree to exchange—swap—payments with each other based on a pre-agreed formula, such as the price of crude oil or interest rates.  For event contracts, the "payoff is based on a specified event or occurrence such as the release of a macroeconomic indicator, a corporate earnings announcement, or the dollar value of damages caused by a hurricane."  CFTC, *Futures Glossary: A Guide to the Language of the Futures Industry*.[1]  Polymarket US offers event contracts subject to and in full compliance with the CFTC's regulatory oversight and federal law.

3.     The CFTC itself has repeatedly reaffirmed that the regulation of exchange-traded event contracts (and other "swaps") falls squarely within its "exclusive jurisdiction" and core institutional responsibility.  7 U.S.C. § 2(a)(1)(A).  In February of this year, the CFTC filed an amicus brief in a case seeking to enjoin the State of Nevada's threatened enforcement action against another designated contract market.  *See N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. 38.2 ("CFTC Ninth Cir. Amicus Brief").  The CFTC explained that its participation was necessary to protect against state efforts to "invade the CFTC's exclusive jurisdiction" over federally regulated derivatives trading.  *Id.* at 2.  "Subjecting derivatives listed on a CFTC-registered [designated contract market] to State regulation," the CFTC warned, "would have destabilizing economic effects," *id.* at 28 (capitalization altered), and "erode the nationally

---

[1] https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm.

2

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

uniform framework Congress established to reduce risk, promote transparency, and safeguard market integrity within the financial system," *id.* at 17–18. When the "federal agency charged with administering and enforcing" the CEA seeks to defend its exclusive authority in related litigation, there can be no serious dispute about where adjudication properly belongs. *See id.* at 1. And earlier this month, the CFTC filed another amicus brief in a Sixth Circuit appeal involving KalshiEX LLC's litigation against Ohio. *See KalshiEX v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), Dkt. 31 ("CFTC Sixth Cir. Amicus Br."). It again asserted its exclusive jurisdiction and warned against the State's "jurisdictional overreach." *Id.* at 1–2, 9.

4. The CFTC has since sought to protect its exclusive jurisdiction by filing lawsuits against multiple States that have sought to outlaw, regulate, or otherwise restrain federally regulated prediction markets. *CFTC Sues Trio of States to Reaffirm its Exclusive Jurisdiction Over Prediction Markets*, CFTC Press Release No. 9206-26 (Apr. 2, 2026) ("*CFTC Press Release*"); *see* Complaint, *United States v. Arizona*, No. 2:26-cv-02246-DMF (D. Ariz. Apr. 2, 2026), Dkt. No. 1 ("Arizona Compl."); Complaint, *United States v. Connecticut*, No. 3:26-cv-00498 (D. Conn. Apr. 2, 2026), Dkt. No. 1 ("Connecticut Compl."); Complaint, *United States v. Illinois*, No. 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026), Dkt. No. 1 ("Illinois Compl."); *see also* Complaint, *United States v. Minnesota*, No. 26-cv-2661 (D. Minn. May 19, 2026) ("Minnesota Compl."); Complaint, *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026), Dkt. No. 1 ("New York Compl."); Complaint, *United States v. Wisconsin*, No. 2:26-cv-00749 (E.D. Wis. Apr. 28, 2026), Dkt. No. 1 ("Wisconsin Compl."). The CFTC explained that those State efforts "intrude[] on the exclusive federal scheme Congress designed to oversee national swaps markets" and, if permitted to continue, would "undermine[] [the] uniformity" Congress mandated, Arizona Compl. ¶¶ 6, 63; New York Compl. ¶¶ 6, 66; Wisconsin Compl. ¶¶ 5, 67; *see also* Connecticut Compl. ¶¶ 3, 9, by

3

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

Case 1:26-cv-00353-PAS Document 13 Filed 05/22/26 Page 4 of 29 PageID #: 95

subjecting CFTC-regulated exchanges to a "fragmented patchwork of state regulations" that have "resulted in poorer consumer protection and increased risk of fraud and manipulation," *CFTC Press Release*, *supra*.

5. The CFTC emphasized that event contracts traded on designated contract markets are "swaps" within the meaning of the CEA and fall squarely within the CFTC's exclusive jurisdiction, which "prohibits States from invading" that authority. Arizona Compl. ¶¶ 7, 10; New York Compl. ¶¶ 7, 10; Wisconsin Compl. ¶¶ 6, 10; *see also* Connecticut Compl. ¶¶ 4, 8; Illinois Compl. ¶¶ 4, 8. Those federally regulated contract markets subject to the CFTC's exclusive jurisdiction include Polymarket US. *See* Illinois Compl. ¶ 37; *see also id*. ¶ 24.

6. In four of its lawsuits—those against Arizona, Minnesota, New York, and Wisconsin—the CFTC has further defended its jurisdiction by moving for preliminary injunctions prohibiting the States from pursuing criminal or civil enforcement actions against CFTC-regulated contract markets or enforcing state laws that outlaw the trading of event contracts. *See* Motion for Preliminary Injunction, *United States v. Minnesota*, No. 26-cv-2661 (D. Minn., May 19, 2026), Dkt. No. 4; Motion for Preliminary Injunction and Temporary Restraining Order, *KalshiEX LLC v. Johnson*, No. 2:26-cv-01715-MTL (D. Ariz., Apr. 8, 2026), Dkt. No. 49; Motion for Preliminary Injunction, *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y., May 1, 2026), Dkt. No. 34; Motion for Preliminary Injunction, *United States v. Wisconsin*, No. 2:26-cv-00749 (E.D. Wis. May 1, 2026), Dkt. No. 6.

7. The only court to rule on the CFTC's request for a preliminary injunction has granted the requested relief: On May 5, the District of Arizona granted the CFTC its preliminary injunction. *See* Order, *KalshiEX LLC v. Johnson*, No. 2:26-cv-01715-MTL (D. Ariz., May 5, 2026), Dkt. No. 96 ("Arizona PI Order"). The court concluded that event contracts are properly

considered "swaps" because they are "tied to the outcome of certain events" and because "stakeholders have financial exposure" to the outcomes of the contracts' underlying events. *Id*. at 6–8. The court then determined that "field and conflict preemption independently bar" Arizona's effort to enforce its gaming laws against another designated contract market, citing the CEA's comprehensive scheme for regulating swaps. *Id*. at 10–15.

8. The State of Rhode Island has chosen to invade the CFTC's exclusive jurisdiction anyway. Without any notice or warning, Plaintiff sued Polymarket US in state court, seeking an order shutting down Polymarket US's federally regulated operations in Rhode Island. That order would directly conflict with federal law and intrude upon the CFTC's exclusive and comprehensive authority to regulate exchange-traded derivatives markets nationwide.

9. The Third Circuit has recently—and squarely—held that state efforts to shut down operations of federally regulated derivatives exchanges are unlawful. *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 226 (3d Cir. 2026). In *Flaherty*, the Third Circuit explained that the CEA "preempts state laws that directly interfere with swaps traded on DCMs" and that "sports-related event contracts are swaps traded on a CFTC-licensed DCM." *Id.* Another district court has also recently held the same. *See KalshiEX LLC v. Orgel*, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) (holding that "sports event contracts are 'swaps'" such that state law is preempted by the CEA).

10. Exchanges like Polymarket US are subject to exclusive federal oversight, not state regulation. Allowing state regulators to shut down derivatives trading by rushing to state courts would fracture the uniform national framework that Congress designed and that the CFTC alone may police.

11. This Court has jurisdiction under 28 U.S.C. § 1442 because Plaintiff's suit directly targets Polymarket US's "act[ions] under" the CFTC. In operating a designated contract market,

5

Polymarket US acts as a "self-regulatory organization" exercising delegated authority from the CFTC. As a self-regulatory organization, Polymarket US does not merely comply with the federal regulatory regime. It is a frontline regulator that assists the CFTC by performing regulatory functions the federal agency itself would otherwise carry out. CFTC Staff Advisory at 1, CFTCLTR No. 26-08 (Mar. 12, 2026) ("*Prediction Markets Advisory*"). And those functions—regulating market access, certifying event contracts for listing, and promulgating and enforcing rules to promote fair and equitable trading and to protect the market and market participants—are exactly what Plaintiff's suit challenges. Because Plaintiff's state-court lawsuit seeks to interfere with the federal government's exclusive authority and the system of self-regulation Congress created, Polymarket US is entitled to have its federal preemption defense resolved in federal court.

12. This Court also has jurisdiction under 28 U.S.C. § 1331. Plaintiff's purported state law claims necessarily turn on disputed questions about the meaning and scope of the federal CEA. Plaintiff's claims expressly raise a question of federal law under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, *et seq.*, and its purported state-law claims necessarily turn on disputed questions about the meaning and scope of the federal CEA. For example, to succeed on its claims, Plaintiff must consider IGRA's definition of "Class III gaming." Plaintiff must further prove that Polymarket US's event contracts are not lawful transactions; this will require Plaintiff to grapple with the legality of the event contracts under the CEA. Again, this Court is the proper forum to resolve those questions of federal law.

## I. Federal Regulatory Authority

13. Defendant Polymarket US operates a federally regulated derivatives exchange on which users nationwide trade event contracts—derivative financial instruments that constitute "swaps" under the CEA. *See* 7 U.S.C. § 1a(47)(A)(ii); *see*, *e.g.*, Arizona Compl. ¶¶ 5, 31, 35.

6

14.     On July 9, 2025, the CFTC formally approved Polymarket US as a designated contract market under the CEA—a designation reflecting an extensive federal finding that Polymarket US satisfies stringent requirements that govern derivatives trading on federal exchanges, including with respect to market integrity, access, transparency, financial safeguards, surveillance, and customer protection.  *See* 7 U.S.C. §§ 7(a), 7(d), 8(a).

15.     When it comes to exchange-traded event contracts, Congress could not have been clearer: the CFTC exercises "exclusive jurisdiction" over transactions involving swaps traded or executed on a designated contract market.  7 U.S.C. § 2(a)(1)(A).  That exclusivity leaves no room to target federally regulated derivatives markets with state licensing regimes, enforcement actions, or injunctive relief.

16.     Polymarket US operates in full compliance with the CFTC's comprehensive regulatory regime, including the CEA's 23 core principles and all CFTC rules governing market participant access, contract design, surveillance, enforcement, dispute resolution, and customer protection.  *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151.

## II.     Rhode Island's Suit Directly Conflicts With Federal Law.

17.     Despite this exclusive federal regime, the State of Rhode Island filed suit against Polymarket US and KalshiEX LLC on May 21, 2026, asserting that federally regulated event contracts are subject to the Rhode Island Constitution and constitute "unauthorized gambling" under Rhode Island law.  Compl. ¶¶ 112, 116 (citing 42 R.I. Gen. Laws § 42-61.2-1, -2.2, -2.3).

18.     Plaintiff's theory is that Polymarket US's activities constitute "sports wagering" as it relates to the Rhode Island Constitution, and "casino gaming" and "online sports wagering" under the Rhode Island General Laws, such that Polymarket US "render[s itself] subject to Rhode Island's gambling laws and regulations."  Compl. ¶¶ 103–109, 112–14.  Plaintiff first claims that

7

Polymarket US "operate[s] in Rhode Island outside of the State's control . . . in violation of Sections 15 and 22 of Article 6 of the Rhode Island Constitution." *Id.* ¶ 106. Plaintiff next claims that "casino gaming" is limited to certain state-run operations and the "full operational control" of the State Lottery. *Id.* ¶ 108. According to Plaintiff, Polymarket US lacks the requisite "license or contract" from the State Lottery to offer "online sports wagering." *Id.* ¶ 110.

19. Plaintiff requests declaratory judgments that Polymarket US's offering of event contracts in Rhode Island is subject to the Rhode Island Constitution, that Polymarket US's event contracts are "casino gaming" and "online sports wagering," that "casino gaming" and "online sports wagering" "are restricted to the operations of" the Rhode Island Lottery, and that Polymarket US is engaging in "unauthorized gambling"; a permanent injunction enjoining and restraining Polymarket US's Rhode Island operations; restitution and disgorgement; and any other relief that the court deems just and proper. Compl. ¶¶ 112–19.

20. Polymarket US will demonstrate that Plaintiff's Complaint fails as a matter of law. Polymarket US's event contracts are not subject to State regulation as "gaming" or "wagering." Congress expressly granted the CFTC—not the States—"exclusive jurisdiction" over exchange-traded event contracts. 7 U.S.C. § 2(a)(1)(A); *see* CFTC Ninth Cir. Amicus Br. 2; CFTC Sixth Cir. Amicus Br. 1. It authorized the CFTC—not the States—to determine whether event contracts involve "gaming" and whether they may be listed or must be prohibited in the public interest. 7 U.S.C. § 7a-2(c)(5)(C). And it did so to ensure that regulation of "market participants" remains "under the oversight of the *Commission*," 7 U.S.C. § 5(b) (emphasis added)—and no "other regulatory agencies," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982).

8

21.     Rhode Island's attempt to override and usurp the CFTC's exclusive federal authority through state-law declarations and injunctions is not regulation—it is unlawful displacement.

## FIRST GROUND FOR REMOVAL: FEDERAL OFFICER REMOVAL

22.     The federal officer removal statute guarantees Polymarket US the right to have its federal preemption defense heard by a federal court.  As a self-regulatory organization, Polymarket US exercises delegated authority under the supervision of the CFTC to carry out functions the CFTC itself would otherwise perform.  And Plaintiff's suit directly targets the way Polymarket US exercises that delegated authority.

23.     The federal officer removal statute authorizes removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  The Supreme Court has emphasized that "the statute must be 'liberally construed'" and that "[t]he words 'acting under' are broad."  *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).  Likewise, "[t]he phrase 'relating to' sweeps broadly," and "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct."  *Chevron USA Inc. v. Plaquemines Par., Louisiana*, 146 S. Ct. 1052, 1060 (2026).  The First Circuit, too, has repeatedly affirmed that removal under Section 1442 is broader than under other removal statutes.  *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 35 (1st Cir. 2022) (holding that 28 U.S.C. § 1442(a)(1) requires only a "relating to" connection, not a causal nexus).

24.     Federal officer removal "is an exception to the 'well-pleaded complaint rule,'" allowing "suits against federal officers to be removed despite the nonfederal cast of the complaint." *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006) (alterations adopted); *Camacho v.*

9

*Autoridad de Telefonos*, 868 F.2d 482, 487 (1st Cir. 1989) (explaining that removal under 28 U.S.C. § 1442(a)(1) "is not vitiated even if the case necessitates the construction and interpretation of state or local law"). In assessing federal officer removal, courts credit the defendant's "theory of the case for purposes" of the "jurisdictional inquiry." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999); *see also Maine v. 3M Company*, 159 F.4th 129, 140 (1st Cir. 2025) (observing that remand to state court "contravenes one of the most important reasons for removal, which is to have the validity of the defense . . . tried in a federal court") (citation modified).

26.     Polymarket US satisfies the three-part test for federal officer removal because (1) it is "a person 'acting under' a federal officer," (2) this suit is "for or relating to any act under color of such office," and (3) it has "a colorable federal defense." *Plaquemines Par.*, 146 S. Ct. at 1057–58. And because Polymarket US is entitled to remove under Section 1442, then "the entire action belongs in federal court." *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 180 (1st Cir. 2024); *see also Conjugal P'ship Comprised by Joseph Jones & Verneta G. Jones v. Conjugal P'ship Comprised of Arthur Pineda & Toni Pineda*, 22 F.3d 391, 396 (1st Cir. 1994) ("By raising a colorable federal defense, a defendant-official converts an otherwise nonremovable state law action into one that falls within the federal court's jurisdiction.").

26.     *First*, Polymarket US is a "person acting under" the CFTC. 28 U.S.C. § 1442(a)(1); *see Express Scripts*, 119 F.4th at 184 n.4 ("A 'person' includes a corporation . . . ."); 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"). And Polymarket US acts under the CFTC because it "assist[s]," and "help[s] carry out, the duties or tasks of" the agency. *Express Scripts*, 119 F.4th at 185.

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

27.     Polymarket US operates its designated contract market subject to the CFTC's direction and "an unusually close [relationship] involving detailed regulation, monitoring, [and] supervision." *Watson*, 551 U.S. at 153.  To operate as a designated contract market, Polymarket US must comply with the CEA's 23 core principles and all CFTC rules governing access, contract design, surveillance, enforcement, dispute resolution, and customer protection.  *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151.  The CFTC has "sweeping authority" to enforce the CEA and its regulations.  *CFTC v. Schor*, 478 U.S. 833, 842 (1986).  The CEA expressly authorizes the CFTC to "review and approv[e] . . . event contracts" and thereby permit those contracts to be "listed" for "trading" on federally registered exchanges.  7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii).  The CFTC may also suspend or revoke the designation of a contract market, *id.* §§ 7b, 8(b), bring administrative enforcement actions, *id.* §§ 9, 13b, and sue in federal court for, among other things, injunctive relief, the rescission of contracts, and the imposition of trading and registration bans, *id.* § 13a-1.

28.     The relationship between Polymarket US and the CFTC, however, goes well beyond that of a highly regulated entity subject to comprehensive supervision.

29.     To achieve the purpose of the CEA, Congress established "a system of effective self-regulation of trading facilities . . . under the oversight of the Commission."  7 U.S.C. § 5(b).  Specifically, Congress granted "self-regulatory organizations such as contract markets . . . a form of delegated [government] discretion" to adopt, implement and enforce regulatory protections— authority that, without contract markets, the CFTC would otherwise exercise itself.  *Barry v. Cboe Glob. Mkts., Inc.*, 42 F.4th 619, 625 (7th Cir. 2022); *see* 17 C.F.R. § 1.3 (including contract markets within the definition of "self-regulatory organization"); *Prediction Markets Advisory* at 1 (contract markets have "self-regulatory obligations for the contract markets they operate").

11

30.     As a designated contract market, Polymarket US "assist[s]," and "help[s] carry out, the duties or tasks of" the CFTC, *Express Scripts*, 119 F.4th at 185, including by "assist[ing] with a governmental function that the government 'itself would have had to perform.'" *Id.* at 185–86 (quoting *Watson*, 551 U.S. at 153–54); *cf. Moore*, 25 F.4th at 34 n.3 ("'[A]cting under' a federal officer . . . contemplate[s] a relationship where the private party engages in an effort 'to assist, or to help carry out, the duties or tasks of the federal superior.'").

31.     In its role as a self-regulatory organization, Polymarket US is specifically charged with a broad array of functions.  For example, a designated contract market is required to "establish, monitor, and enforce compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market," and "rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2).

32.     A designated contract market also has the "responsibility to prevent manipulation, price distortion, and disruptions . . . through market surveillance, compliance, and enforcement practices and procedures." 7 U.S.C. § 7(d)(4).

33.     A designated contract market likewise must "establish and enforce rules" "to protect markets and market participants from abusive practices committed by any party, including abusive practices committed by a party acting as an agent for a participant." 7 U.S.C. § 7(d)(12). To that end, it also must "maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information" "to assist in the prevention of customer and market abuses." *Id.* § 7(d)(10).

34.     These rules, the CFTC has explained, "play" an "important role . . . in promoting the integrity of derivatives markets." *Prediction Markets Advisory* at 2.

12

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

Case 1:26-cv-00388-JJM-PAS Document 1 Filed 05/22/26 Page 13 of 22 PageID #: 104

35. To implement or revise a rule, a designated contract market must either submit the rule for CFTC approval or certify that the contract complies with federal law and the Commission's requirements. 7 U.S.C. § 7a-2(c)(1). The CFTC may allow the rule to go into effect, or it may stay the rule's certification pending further review. *Id.* § 7a-2(c)(2)–(3).

36. Similarly, to list new event contracts, the entity must either submit the event contract for CFTC approval or certify that the contract complies with federal law and the Commission's requirements. 7 U.S.C. § 7a-2(c)(1), (4)(A), (5)(C); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c). The CFTC retains authority to investigate, stay, or amend the contract after it has been listed. 17 C.F.R. § 40.2(c). If the CFTC determines that a proposed "[e]vent contract" involves certain subjects, including "gaming," it has the discretion to prohibit the listing if the contract would be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

37. And, once listed, designated contract markets must "provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process." 7 U.S.C. § 7(d)(9)(A). They must also "establish, monitor, and enforce compliance with" rules relating to "access requirements," *id.* § 7(d)(2)(A)(i), and "establish and enforce rules . . . to promote fair and equitable trading on the contract market," *id.* § 7(d)(12)(B). To that end, CFTC regulations impose additional "impartial access" requirements, mandating that a contract market provide market participants with nondiscriminatory access and adopt and fairly enforce rules governing denials, suspensions, and terminations of access. 17 C.F.R. § 38.151(a)–(c).

38. In all of these respects, a designated contract market exercises authority delegated by the federal government, "perform[ing] a job that" otherwise "the Government itself would have had to perform." *Watson*, 551 U.S. at 154. Because Polymarket US's actions involve "an effort

13

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

Case 1:261-cv-00388-JSM-PAS Document 13 Filed 05/22/26 Page 14 of 22 PageID #: 105

to assist, or to help carry out, the duties or tasks of the federal superior," the CFTC, Polymarket US "'act[s] under'" that agency. *Id.* (emphasis omitted).

39. *Second*, Rhode Island's lawsuit directly challenges actions Polymarket US takes under the authority, supervision, and jurisdiction of the CFTC.

    a. Plaintiff says that by offering its platform and operations to Rhode Island residents, Polymarket US "render[s itself] subject to Rhode Island's gambling laws and regulations" and thus "operate[s] in Rhode Island outside of the State's control . . . in violation of Sections 15 and 22 of Article 6 of the Rhode Island Constitution." Compl. ¶¶ 105–06. Yet federal law directs Polymarket US to "establish, monitor, and enforce compliance" with "access requirements," 7 U.S.C. § 7(d)(2), and provide "impartial access to its markets and services," 17 C.F.R. § 38.151(b).

    b. Plaintiff seeks to impose liability on Polymarket US based on event contracts that Plaintiff believes to be illegal. *See* Compl. ¶¶ 8–11, 111–19. But Polymarket US offers those event contracts pursuant to its status as a federally designated contract market subject to comprehensive CFTC oversight.

    c. Plaintiff says that Polymarket US establishes a market allowing "bettors to wager on both the outcome of sports matches and the performance of individual players in those matches," which it characterizes as illegal "gambling." Compl. ¶¶ 61–64. But federal law requires Polymarket US to "establish, monitor, and enforce [its users'] compliance" with its rules, including by setting "the terms and conditions of any contracts to be traded on the contract market" and "detect[ing], investigat[ing], and apply[ing] appropriate sanctions" to violators. 7 U.S.C. § 7(d)(2)(A)–(B).

d. Plaintiff says that Polymarket US "make[s] available such sports-related 'event contracts' to Rhode Islanders both online and through [its] mobile app[]." Compl. ¶¶ 57, 102. Yet federal law requires Polymarket US to "provide a competitive, open, and efficient market and mechanism for executing transactions." 7 U.S.C. § 7(d)(9)(A). And, again, federal law directs Polymarket US to provide "impartial access to its markets and services." 17 C.F.R. § 38.151(b).

40. In other words, the connection "between [Polymarket US's] challenged conduct and the performance of its federal duties" is hardly "tenuous, remote, or peripheral"—it is close and direct. *Plaquemines Par.*, 146 S. Ct. at 1061.

41. *Third*, Plaintiff's claims are preempted by federal law, which qualifies as a colorable federal defense. *Express Scripts*, 119 F.4th at 190–92 (finding a plausible preemption defense sufficient for federal officer removal); *see*, *e.g.*, *Flaherty*, 172 F.4th at 227–28 (holding that the CEA preempted similar state-gaming enforcement by New Jersey); *Orgel*, 2026 WL 474869, at *1 (same with respect to Tennessee).

42. Preemption follows from the express language of the CEA, which grants "exclusive jurisdiction" over exchange-traded swaps to the CFTC, not state regulators. 7 U.S.C. § 2(a)(1)(A). Federal law authorizes the CFTC, not state regulators, to determine whether event contracts involve "gaming" and may be listed on federally regulated exchanges. 7 U.S.C. § 7a-2(c)(5)(C). And Congress ensured that the CFTC—and no "other regulatory agencies"—would establish a uniform, comprehensive regulatory framework to avoid fracturing national derivatives markets. *Merrill Lynch*, 456 U.S. at 386; *see Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1157 (7th Cir. 1992) (state efforts to interfere with "the operation of a contract market" "are preempted by the CEA").

15

43. "One of the primary purposes of the removal statute . . . was to have [federal officers'] defenses litigated in the federal courts." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

44. This Court can and should recognize its jurisdiction under § 1442(a)(1) to ensure that Polymarket US's preemption defense is fairly and fully litigated.

### SECOND GROUND FOR REMOVAL: FEDERAL QUESTION JURISDICTION

45. This case belongs in federal court because it arises under federal law. *See* 28 U.S.C. § 1331.

46. Plaintiff's claims are expressly based upon federal law and require the adjudication of federal-law issues that are "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prods., Inc. v. Dante Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005)).

47. Take, for example, Plaintiff's claim that Polymarket US's event contracts are "casino gaming" under Rhode Island law. Compl. ¶¶ 107, 113 (citing 42 R.I. Gen. Laws § 41-61.2-1(2)). As the Complaint itself makes plain, the State defines "casino gaming" as any "game or device included within the definition of Class III gaming *as that term is defined in Section 2703(8) of Title 25 of the United States Code*." 42 R.I. Gen. Laws § 42-61.2-1(2) (emphasis added); Compl. ¶¶ 30, 107. Plaintiff's claim under this section raises the issue of whether Polymarket US's event contracts fall within that definition.

48. This issue necessarily requires Plaintiff to contend with federal law. Rhode Island law "express[ly] incorporat[es]" federal law by defining "casino gaming" in relation to IGRA. *See R.I. Fisherman's All., Inc., v. R.I. Dep't of Env't Mgmt.*, 585 F.3d 42, 50 (1st Cir. 2009).

16

Accordingly, "the federal question here is inherent in the state-law question itself because the state statute expressly references federal law." *Id.* Indeed, "it is not logically possible for [Plaintiff] to prevail on this cause of action without affirmatively answering the embedded question of whether federal law" considers Polymarket US's event contracts to be Class III gaming under IGRA. *See id.* at 49–50. "That is enough to make out a federal question." *Id.* at 49; *accord R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*, 92 F.4th 330, 342 (1st Cir. 2024) (same).

49.     Because Plaintiff's claim depends on establishing that Polymarket US's event contracts qualify as "Class III gaming" under IGRA, "federal law [also] creates the cause of action asserted." *Gunn*, 568 U.S. at 257. This action thus "arises under" federal law within the meaning of 28 U.S.C. § 1331, rendering removal proper under 28 U.S.C. § 1441. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 559 (2005) ("If the court has original jurisdiction over a single claim in the complaint, it has original jurisdiction over a 'civil action' within the meaning of § 1367(a)."). At a minimum, Plaintiff's claim obviously and necessarily requires the Court to interpret and apply disputed questions of federal law.

50.     As another example, consider Plaintiff's claim that Polymarket US's event contracts constitute "online sports wagering." Compl. ¶¶ 109, 114. "Online sports wagering" is defined in part as "engaging in the act of sports wagering by the placing of wagers on sports events." 42 R.I. Gen. Laws § 42-61.2-1(27). But the definition of "wager" requires Plaintiff to grapple with federal law. Rhode Island law has long recognized the difference between "wagers" or "gambling transaction[s]" and "lawful trading." For example, in *Winward v. Lincoln*, the Supreme Court of Rhode Island considered whether a certain transaction was a lawful, legitimate transaction or instead a wagering contract. 51 A. 106, 107 (1902). The court distinguished "lawful trading" from "gambling transaction[s]," and concluded that "lawful trading in stocks has the same

17

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

Case 1:261-cv-003833M-PAS Document 1 Filed 05/22/2605/27/26 18 Page 23 Page ID 5 PageID #: 109

characteristics as *lawful trading in any commodity*." *Id.* at 114 (emphasis added). Plaintiff's claim here thus raises the issue of whether the event contracts at issue here are "lawful" and "legitimate transaction[s]." *See id.* at 112.

51.     This issue again necessarily requires Plaintiff to contend with federal law. Determining whether an event contract is "lawful trading" or instead a "gambling transaction" requires an inquiry into both state and federal law. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 157 (1982) ("[T]he Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution."); *Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 380 (1990) ("The federal law is law in the State as much as laws passed by the state legislature."). "As a result, whether the contracts at issue are unlawful gambling contracts—or instead federally authorized event contracts—cannot be resolved by reference to [state] law alone." *Ga. Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 279375, at *3 (M.D. Ga. Feb. 3, 2026).

52.     Polymarket US's event contracts are lawful, valid swaps under the CEA. The CEA defines "swap" broadly, 7 U.S.C. § 1a(47)(A), such that Polymarket US's event contracts fall within its definition. Plaintiff's ability to demonstrate that event contracts are *not* lawful and therefore sustain a claim upon which relief may be granted "necessarily depends on the interpretation and application of the CEA and the scope of the CFTC's exclusive jurisdiction." *See Ga. Gambling*, 2026 WL 279375, at *3.

53.     Allowing a state court to adjudicate the legality of—and enjoin the trading of—federally regulated swaps would fracture national derivatives markets and undermine the uniformity Congress deemed essential by granting the CFTC exclusive jurisdiction over these markets. The CFTC said as much just this month. *See, e.g.*, CFTC Sixth Cir. Amicus Br. 2 (noting

18

State's "jurisdictional overreach" could "imperil[]" the CFTC's "longstanding jurisdiction" over event contracts and that issues "may extend to other forms of derivatives trading"); Minnesota Compl. ¶¶ 81–84.  Upholding federal jurisdiction here does not disrupt the federal-state balance; it enforces it.

## ALL REMOVAL REQUIREMENTS ARE MET

54.     Based on the foregoing facts and allegations, this Court has original jurisdiction over this action because Plaintiff's claims are for or relating to actions that Polymarket US took under color of federal office.

55.     Based on the foregoing facts and allegations, this Court also has original jurisdiction over this action because the Complaint arises under and necessarily raises substantial, disputed federal questions that belong in a federal court.

56.     Venue is proper in this Court because the United States District Court for the District of Rhode Island is the federal judicial district embracing the Providence County Superior Court, where Plaintiff originally commenced the state court action.  28 U.S.C. §§ 1391, 1441(a), 1446(a).

57.     Removal is timely because Polymarket US has not yet been served, meaning it necessarily has not been more than 30 days since service of Plaintiff's Complaint.  28 U.S.C. §§ 1446(b)(1), (2)(B).

58.     A copy of Plaintiff's complaint is attached hereto.  28 U.S.C. § 1446(a).

59.     Polymarket US will provide Plaintiff with written notice of this filing and will promptly file a true and correct copy of this Notice of Removal with the Clerk of the Providence County Superior Court.  The Notice of Filing of Notice of Removal to be filed with Providence County Superior Court is attached.  28 U.S.C. § 1446(d).

19

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

60. By filing this Notice of Removal, Polymarket US does not waive any objections as to notice, service, personal jurisdiction, venue, or any other defenses. Polymarket US reserves all of its defenses, and this Notice of Removal is filed subject to full reservation of any rights and all objections, arguments, and defenses to Plaintiff's Complaint.

## CONCLUSION

61. Polymarket US hereby removes this action and respectfully requests that the Court retain jurisdiction for all further proceedings in this matter.

Dated: May 22, 2026

Respectfully submitted,

/s/ Matthew H. Parker
WHELAN CORRENTE & FLANDERS LLP

Matthew H. Parker (#8111)
100 Westminster Street, Suite 710
Providence, RI 02903
Telephone:  401.270.4500
Fax: 401.270.3760
mparker@whelancorrente.com

Orin Snyder*
Matt Benjamin*
Amanda LeSavage*
GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene*
GIBSON DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

*Applications for pro hac vice forthcoming

Attorneys for Defendant QCX LLC d/b/a
Polymarket US

21

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

## CERTIFICATION OF SERVICE

I hereby certify that the within document has been electronically filed and served with the Court on the 22nd day of May 2026, and is available for viewing and downloading from the ECF system.

/s/ Matthew H. Parker

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

**STATE OF RHODE ISLAND**                    SUPERIOR COURT
**PROVIDENCE COUNTY**

---

THE STATE OF RHODE ISLAND by and
through ATTORNEY GENERAL PETER F.
NERONHA,

   *Plaintiff*,

v.                                           C.A. No. PC-2026-

KALSHIEX LLC.;   QCX,   LLC   d/b/a
POLYMARKET US

   *Defendants*.

---

### PETITION FOR DECLARATORY JUDGMENT

Pursuant to R.I. Gen. Laws § 9-30-1 et seq., R.I. Super. Ct. R. Civ. P. 57, and the legal and equitable powers of this Court, the State of Rhode Island, by and through Attorney General Peter F. Neronha, petitions this Court for a declaration confirming that by offering to Rhode Islanders sports-related "event contracts" on "prediction markets," Kalshi and Polymarket are facilitating gambling that is subject to Rhode Island's constitutional, statutory, and regulatory requirements.

### INTRODUCTION

1. Under the Tenth Amendment to the Constitution of the United States, the individual states possess general police powers to protect the health, safety, welfare, and morals of their citizens.

2. Historically and through the present, state regulation of gambling—traditionally defined as any activity involving the elements of consideration, chance, and prize—is one

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

straightforward example of the exercise of state police power, as has been repeatedly and consistently recognized by state and federal courts in Rhode Island and elsewhere.[1]

3.      State regulation of gambling serves a number of compelling public interests, including revenue generation, protecting consumers from fraud, and safeguarding vulnerable populations, such as minors and those susceptible to addiction, from the risks of problem gambling by ensuring the existence of appropriate controls.

4.      In Rhode Island, gambling, including sports betting, is subject to layers of constitutional, statutory, and regulatory restrictions and safeguards, through which the State itself retains and exercises operational control over permissible gambling operations.[2]

5.      At present, with few limited exceptions, legal gambling in Rhode Island is operated by the State principally through the State licensed and operated casinos at Bally's Twin River in Lincoln Casino Resort in Lincoln, RI and Bally's Tiverton Casino and Hotel in Tiverton, RI (collectively, "Twin River"), under the chief regulatory authority of the State Lottery Division ("Rhode Island Lottery" or "RILOT").  Since 2018, when states recovered the ability to legalize and regulate sports betting at the state level, this has included all wagering on sports.

6.      In 2019, the General Assembly further authorized RILOT to operate and regulate "online sports wagering," defined as "the placing of wagers" on sports events or individual athletic

---

[1] *See, e.g., In re Advisory Opinion to Governor*, 856 A.2d 320, 323 (R.I. 2004) ("the General Assembly has plenary power to legislate on all matters pertaining to gambling in this state"); *Allendale Leasing, Inc. v. Stone*, 614 F. Supp. 1440, 1454 (D.R.I. 1985) ("It cannot be gainsaid that a state government may lawfully prohibit gambling in the exercise of its police power"); *Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905) (Regulation of gambling is "concededly within the police powers of a state").

[2] *See Harrop v. The Rhode Island Div. of Lotteries*, PC-2019-5273, 2020 WL 3033494, at *8 (R.I. Super. Ct. June 01, 2020) (J. Stern) (finding "that sports wagering is a type of Class III gaming, Class III gaming is a form of casino gaming, and through the Casino Gaming Acts, the voters approved casino gaming").

2

performance online or through RILOT-approved mobile applications ("apps"). R.I. Gen. Laws § 42-61.2-1(27).

7. Since that time, the exclusive State-approved platform for online sports wagering in Rhode Island is Sportsbook Rhode Island® ("Sportsbook RI"). Bets placed through Sportsbook RI are, like all other forms of permitted gambling in Rhode Island, subject to the State's operational decisions, the State's allocation of revenue to the State's selected vendors, RILOT's rules and regulations, and all other applicable Rhode Island legal requirements.

8. Recently, however, non-resident Defendants Kalshi and Polymarket ("Defendants") have begun to advertise and offer to Rhode Islanders a form of betting completely outside of the State's tightly-regulated gambling framework: so-called "event contracts" on "prediction markets."[3]

9. Online and through their apps, Kalshi and Polymarket allow Rhode Islanders to place wagers on the outcome of real-world events, including sports matches, with those who guess (or predict) the correct outcomes winning monetary awards. Bearing the classic hallmarks of consideration (the wager), chance (the "prediction" or bet), and prize (the award)—not to mention a host of other features designed to resemble a sportsbook—Kalshi and Polymarket's sports-related "event contracts" are no different from traditional sports betting.

10. Kalshi and Polymarket, however, lack any of the necessary prerequisites to carrying out a legal gambling operation in Rhode Island—such as the constitutionally-mandated voter approvals and the required relationship with the Rhode Island Lottery, including but not limited to

---

[3] The State uses the term "event contract" throughout this complaint to refer to the wagers that Defendants advertise and make available to Rhode Islanders through their platforms, even though Defendants may at times refer to their offerings by other names, such as "shares," "futures," "swaps," or "derivatives."

a license and State oversight by the Rhode Island Lottery. Ignoring these requirements, Kalshi and Polymarket maintain through both their actions and public statements that their platforms are "legally" available to Rhode Islanders.

11. Through this action, the State seeks a ruling from the Court confirming that Kalshi and Polymarket's sports-related "event contracts" are indeed subject to Rhode Island's constitutional, statutory, and regulatory restrictions on gambling.

## PARTIES

12. Plaintiff is the State of Rhode Island, represented by Attorney General Peter F. Neronha, who brings this action as the State's chief law enforcement officer and attorney for the State in accordance with his constitutional, statutory, and common law authority.

13. Defendant KalshiEX LLC ("Kalshi") is a Delaware limited liability company with its principal place of business in New York, New York. Kalshi is a wholly owned subsidiary of Kalshi Inc. Through its website and mobile application ("app"), Kalshi offers sports-related "event contracts" on a "prediction market" to Rhode Island residents.

14. Defendant QCX LLC d/b/a Polymarket US ("Polymarket") is a Delaware limited liability company with its principal place of business in New York, New York. Through its website and mobile app, Polymarket offers sports-related "event contracts" on a "prediction market" to Rhode Island residents.

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction over this case under the Uniform Declaratory Judgments Act, R.I. Gen. Laws § 9-30-1 *et seq.*

16. The Court has personal jurisdiction over non-resident Defendants under R.I. Gen. Laws § 9-5-33(a) because, among other things, Defendants advertise and offer to Rhode Islanders sports-related "event contracts" on "prediction markets."

4

17. Venue in this Court is proper as the State is the plaintiff and has its principal offices in Providence County. R.I. Gen. Laws § 9-4-3.

## THE STATE'S CONSTITUTIONAL AND STATUTORY AUTHORITY TO OPERATE AND REGULATE GAMBLING

**A.    Rhode Island's Well-Established Legal Framework for Permissible Gambling**

18. The prohibition and regulation of gambling stands at the heart of the State's historic police powers and its fundamental duty to protect the health, welfare, safety, and morals of its citizens.

19. The history of state regulation over gambling predates our nation's founding. In 1638, for example, the Massachusetts Bay Colony enacted idleness laws that barred people from possessing cards, dice, or other gambling devices. George C. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch. & Rev. J. 65, 66 (1996).

20. By the time of the American Revolution, the colonies sought to regulate gambling as a matter of wartime civic virtue. In October 1774, in response to the punitive "Intolerable Acts" imposed on the colonies by the British, the First Continental Congress (to which Rhode Island belonged) adopted the Articles of Association, which, in addition to embracing a boycott of British goods and an end to the slave trade, pledged to "discountenance and discourage every species of extravagance and dissipation, especially all horse-racing and all kinds of games, cock fighting," and other activities.

21. Rhode Island soon followed with an early form of our centuries-old tradition of state prohibition and regulation of gambling: in 1777, the General Assembly passed an "Act to Prevent Horse Racing," which provided for the forfeiture of horses used in races and authorized proceedings by information. *See* 1777 R.I. Acts & Resolves 7 (Sept. Adjourned Session).

5

22.     To this day, the same basic exercise of the state's police power over gambling is reflected in several provisions of the Rhode Island Constitution.

23.     Since its ratification in 1842, the Rhode Island Constitution has contained a broad prohibition on all "lotteries" in the state.  In 1973, the General Assembly amended that provision—what is now Article 6, Section 15—to specifically allow only "lotteries operated by the state" and "those previously permitted by the general assembly prior to the adoption of this section," and subjected them "to the proscription and regulation of the general assembly."  As a result of this amendment, in 1974, the General Assembly passed legislation creating RILOT and the Rhode Island Lottery.[4]  R.I. Gen. Laws § 42-61-1 *et seq.*

24.     The Supreme Court of Rhode Island has interpreted Article 6, Section 15 broadly to extend to any "scheme or plan having three essential elements: consideration, chance, and prize."  *In re Advisory Opinion to the Governor*, 856 A.2d 320, 327 (R.I. 2004) (quoting *Roberts v. Comms. Investment Club of Woonsocket*, 431 A.2d 1206, 1211 (R.I. 1981)).  Under this section, it is illegal for non-state actors to operate any "scheme or plan" that rewards bets or wagers placed on outcomes determined primarily by chance.

25.     Article 6, Section 22 of the Rhode Island Constitution, first enacted in 1994 and later amended in 2014, additionally requires statewide and local referenda before expanding "the types or locations of gambling" within the State.

26.     The Supreme Court of Rhode Island has interpreted the Constitution's term "gambling" even more broadly than "lottery," explaining that "gambling" includes bets or wagers

---

[4] Between 1842 and 1974, Rhode Island maintained a near-total prohibition on state-sanctioned gaming.  This restriction was partially lifted in 1934, when Rhode Island voters approved a measure to legalize pari-mutuel betting, which first extended to horse racing at Narragansett Park in Pawtucket, and later to dog racing in Lincoln and jai alai in Newport.

6

on activities that depend primarily on skill or judgment, *as well as* lotteries, which depend primarily on chance. *In re Advisory Opinion*, 856 A.2d at 333-34. In other words, whether bettors are wagering on games of chance or skill, the Rhode Island Constitution mandates that they may do so legally in Rhode Island only upon the approval of Rhode Island voters in state and local referenda.

27. The General Assembly, exercising its plenary authority to regulate gambling, has enacted a statutory scheme authorizing and outlawing certain gambling activities in the state, including in our criminal code. Under that scheme, it is a felony to offer any form of gambling beyond those authorized in Chapter 19 of Title 11 (the "Gambling and Lotteries" chapter of Rhode Island's criminal code) or Chapters 61 (establishing the State Lottery) or 61.2 (the Casino Gaming Acts) of Title 42. R.I. Gen. Laws § 11-19-1.

28. Likewise, the General Assembly has deemed it a crime punishable by up to a year in prison to engage (except as permitted under the state's pari-mutuel betting system or authorized by the Rhode Island Lottery) in "pool selling or bookmaking," or (among other activities) to "record or register bets or wagers . . . upon the result of any trial or contest of skill, speed, or power of endurance of man or beast, or upon the result of any political nomination, appointment, or election . . . or [to] keep, exhibit, or employ any device or apparatus for the purpose of recording bets or wagers . . . or [to] receive, register, record, forward . . . within or outside this state, any money, thing, or consideration of value bet or wagered . . . upon the speed or endurance of any man or beast[.]" *Id.*, § 11-19-14.

29. In 2011, the General Assembly significantly expanded legal gambling in Rhode Island when it authorized "state-operated casino gaming" at Twin River-Lincoln, conditioned on

7

the voter-approval requirements of Article 6, Section 22, and subject to the state's "full operational control" through RILOT, in satisfaction of Article 6, Section 15. *Id.* § 42-61.2-2.1.

30.     The General Assembly defined "casino gaming" broadly to include "any and all table and casino-style games . . . or any other game or device included within the definition of Class III gaming as that term is defined in Section 2703(8) of Title 25 of the United States Code." *Id.*, § 42-61.2-1(2).

31.     Rhode Island courts have recognized that Class III gaming is a "catchall phrase" that encompasses all forms of gambling that are not "social and traditional games played for prizes of minimal value" (Class I) or "bingo-like games" (Class II). *Harrop v. Rhode Island Div. of Lotteries*, PC-2019-5273, 2020 WL 3033494, at *8 (R.I. Super. Ct. June 1, 2020) (Stern, J.) (quoting *In re Advisory Opinion*, 956 A.2d at 329 n.4).

32.     The 2011 Twin River-Lincoln statute was subsequently approved by Rhode Island voters in state and local referenda in 2012.

33.     The next year, in 2013, the General Assembly established a criminal law enforcement structure specifically for "casino gaming," by creating the Gaming Enforcement Unit of the Rhode Island State Police, R.I. Gen. Laws § 42-61.3-1, and granting it the authority to "monitor and investigate criminal violations relating to casino gaming activities consistent with chapter 61.3," *Id.*, § 42-61.2-2.1(f).

34.     In addition to a host of new criminal prohibitions intended to prevent cheating and protect the basic integrity of "casino gaming" in Rhode Island, the General Assembly declared it a felony to "[c]onduct a gaming operation, or attempt to conduct a gaming operation, where wagering is used . . . without a licensed issued by . . . [RILOT]." *Id.* § 42-61.3-2(b)(18). "Gaming operation" in this context refers to "casino gaming" as defined in § 42-61.2-1. "'Wager' means a

8

sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." *Id.*, § 42-61.3-2(a)(7).

35.     In 2016, the General Assembly authorized (and Rhode Island voters subsequently approved) the expansion of "state-operated casino gaming" to Twin River in Tiverton, again subject to RILOT's "full operational control." R.I. Gen. Laws § 42-61.2-2.3.

**B.     Sports Betting Must Be State-Operated and—Like All Other Forms of Permissible Gambling in Rhode Island—Is Subject to Strict State Control**

36.     In May 2018, the Supreme Court of the United States struck down as unconstitutional the Professional and Amateur Sports Protection Act (PASPA), the federal statute that had prohibited states from authorizing sports betting. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018).

37.     Just a month later, the General Assembly passed legislation that legalized sports betting in Rhode Island and brought it within the State's existing operational and regulatory framework. Specifically, the General Assembly authorized RILOT to "implement, operate, conduct, and control sports wagering at" Twin River, once more with "full operational control" vested in RILOT. R.I. Gen. Laws § 42-61.2-2.4.

38.     The General Assembly broadly defined sports wagering as "the business of accepting wagers on sporting events or a combination of sporting events, or on the individual performance statistics of athletes in a sporting event or combination of sporting events, by any system or method of wagering. The term includes, but is not limited to, exchange wagering, parlays, over-under, moneyline, pools, and straight bets, and the term includes the placement of such bets and wagers." *Id.* § 42-61.2-1(39).

39.     In 2019, the General Assembly further expanded the availability of sports betting in Rhode Island by authorizing "online sports wagering," defined as "engaging in the act of sports

9

wagering by the placing of wagers on sporting events or a combination of sporting events, or on the individual performance statistics of athletes in a sporting event or a combination of sporting events, over the internet through computers, mobile applications on mobile devices or other interactive devices approved by [RILOT]." *Id.*, § 42-61.2-1(27).

40.  Again, the General Assembly specified that "online sports wagering" would be subject to strict state control, including statutorily-imposed revenue sharing and geo-location requirements. Under § 42-61.2-5(a)(1), the state receives 51% of all in-person and online sports wagering revenues. The servers that support "online sports wagering" must be physically located within a "restricted area" at Twin River, and any "online sports wagering" vendor must also "employ a mechanism to detect the physical location of a player at the time the player is wagering" to ensure he or she is located within Rhode Island. *Id.*, § 42-61.2-16.

41.  Additionally, the General Assembly authorized RILOT to promulgate rules and regulations applicable to online sports wagering, *id.* § 42-61.2-3.3, and to "enter into contracts for the provision of server-based gaming systems, facilities, and related technology necessary or desirable for the state-operated online sports wagering," *id.* § 42-61.2-4(5).

42.  RILOT has since promulgated rules and regulations applicable to online sports wagering.[5] These regulations impose on any online sports wagering "service provider" a host of additional requirements, including identity and age verification and "know your customer" (KYC) controls, monitoring and reporting of suspicious gambling activity, and responsible gaming protocols such as deposit limits, wager limits, time limits, and player self-exclusion.

---

[5]  R.I. State Lottery Div., Rules and Regulations (Feb. 20, 2026), *available at* https://www.rilot.com/content/dam/interactive/ilottery/pdfs/about-us/RILotteryRules_2026.pdf.

10

43. From 2019 until the present, RILOT has exclusively contracted with service provider International Game Technology (IGT) (in coordination with Twin River) for the delivery of "online sports wagering" in Rhode Island, through the technology platform called "Sportsbook Rhode Island®," which is available to Rhode Islanders in web browser and mobile app formats.

## KALSHI AND POLYMARKET FACILITATE GAMBLING IN RHODE ISLAND

### A. Kalshi and Polymarket Offer "Event Contracts" on "Prediction Markets" to Rhode Islanders

44. "Prediction markets" like the ones offered to Rhode Islanders by Kalshi and Polymarket allow users to place online wagers on the outcome of future events. In this context, the wagers are in the form of so-called "event contracts" that users buy and sell (or "trade") on "prediction markets," based on the perceived likelihood of a given event occurring or not occurring.

45. As Kalshi explains on its website, its platform "allows traders to buy and sell contracts on the outcomes of real-world events. Whether you're interested in forecasting economic indicators, political outcomes, sports results, or cultural milestones, Kalshi is a regulated venue where you can put your predictions – and your money – where your mouth is."[6]

46. Likewise, Polymarket, which advertises itself as "the world's largest predication market," states that its platform is "where people can bet on the outcome of future events. By buying and selling shares in the outcomes, participants can collectively forecast the likelihood of events such as sports results, political elections, or entertainment awards."[7]

47. Like gambling more generally, these prediction markets—and the speculative betting they facilitate—have grown like wildfire in the United States, consuming more and more

---

[6] https://news.kalshi.com/p/what-is-kalshi-f573
[7] https://help.polymarket.com/en/articles/13364272-what-is-a-prediction-market

11

of Americans' time, attention, and money. One estimate holds that the industry expanded nearly 200-fold in 2025, hitting $44 billion in trade volume, and could reach a trillion dollars in annual volume by 2030.

48.     Kalshi and Polymarket dominate the present market for these platforms: of the approximately $44 billion in "prediction market" trade volume in 2025, Polymarket facilitated around $21.5 billion in trades, while Kalshi facilitated roughly $17.1 billion—together totaling around $38.6 billion, or 87%, of all prediction market trading.

49.     Kalshi and Polymarket allow users to place wagers on a broad, and seemingly ever-expanding, array of topics, ranging from local and national politics, to the prices of commodities like oil and gas and precious metals, to the outcome of professional, amateur, and collegiate sports matches.

50.     Kalshi and Polymarket explain that the pricing of "event contracts" is "dynamic" and reflective of the likelihood that the given event (the subject of the contract) occurs.

51.     According to Kalshi, "[t]hese event contracts work through a straightforward pricing system. Each contract is priced between one cent and 99 cents, with the price reflecting the market's collective assessment of the probability that an event will occur. For example, if a contract asking 'Will the government shut down by February 31?' is trading at 30 cents for 'Yes,' the market believes there's roughly a 30% chance of that outcome. When you purchase a contract, you're essentially buying a position on a specific outcome. If your prediction proves correct when the event resolves, each contract pays out one dollar. If you bought a 'Yes' contract at 30 cents and the event occurs, you profit 70 cents per contract. Conversely, if the event doesn't happen, you lose your initial stake."[8]

---

[8] https://news.kalshi.com/p/what-is-kalshi-f573

52.     Polymarket similarly states that "Market Prices = Probabilities:  The price of shares in a prediction market represents the current probability of an event happening.  For example, if shares of an event are trading at 20 cents, it indicates a 20% chance of that event occurring . . . If the event occurs, each share becomes worth $1, yielding a profit."[9]

53.     Kalshi and Polymarket profit from the trading of these "event contracts" through the assessment of "transaction" or "trading" fees.

54.     Kalshi states that it "facilitates [the] transactions and generates revenue through small transaction fees on each trade,"[10] with its standard fee for "most markets" ranging from 0.07 cents to $1.75 per 100 contracts.[11]

55.     According to Polymarket, it also charges "trading fees," but only for "certain markets."  Whereas "geopolitical and world events" are "completely fee-free," Polymarket states, trading on sports-related events (referred to as "Polymarket Sports markets") are subject to a recently "updated fee structure with a peak effective fee of 0.75% at the 50/50 price point."[12]

**B.     Defendants' Sports-Related "Event Contracts" Allow Users to Place Wagers on Match Outcomes and the Performance of Individual Athletes**

56.     Kalshi and Polymarket offer event contracts on the outcomes of sports-related events across literally dozens of kinds of sports and similar activities, ranging (depending on the time of year) from basketball, baseball, soccer, and hockey, to chess, table tennis, and sumo wrestling.[13]

57.     Kalshi and Polymarket make available such sports-related "event contracts" to Rhode Islanders both online and through their mobile apps.

---

[9] https://help.polymarket.com/en/articles/13364272-what-is-a-prediction-market
[10] https://news.kalshi.com/p/what-is-kalshi-f573
[11] https://kalshi.com/fee-schedule
[12] https://help.polymarket.com/en/articles/13364478-trading-fees
[13] https://kalshi.com/category/sports/other; https://polymarket.com/sports/live

13

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

58.     The business of "trading" sports-related "event contracts" on "prediction markets" comes right at a time when sports betting has exploded in popularity in the United States.  By one recent estimate, nearly 50% of American men aged 18-49 years old have an active account with at least one online sportsbook.[14]

59.     It is no surprise, then, that sports have quickly come to dominate "trading" activity on Kalshi and Polymarket: in 2025, *the very first year* that Defendants offered sports-related wagering on their platforms, sports represented roughly 85% of Kalshi's trade volume, as well as 39% of Polymarket's total volume—more than any other "trading" category on its platform.[15]

60.     The growing prevalence and use of such "prediction markets" to wager on sports is especially concerning, given the well-documented harms associated with problem gambling, ranging from increased debt and financial pressures to extreme mental health risks and even suicide.

61.     Kalshi and Polymarket's sports-related "event contracts" allow bettors to wager on both the outcome of sports matches and the performance of individual players in those matches.

62.     For example, in connection with the NBA playoff matchup between the Philadelphia 76ers and the New York Knicks on May 6, 2026, Kalshi invited wagers (or "event contracts") on both the winning team as well as a number of individual player statistics (labeled "player props"):

---

[14]https://sri.siena.edu/2025/02/18/22-of-all-americans-half-of-men-18-49-have-active-online-sports-betting-account/
[15] https://keyrock.com/prediction-markets-the-next-frontier-of-financial-markets/.

14

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

# Kalshi - Match Outcome



Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

## Kalshi – Player Performance



Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

63.    Polymarket offered nearly identical wagers for the same May 6 matchup, using a strikingly similar layout:

**Polymarket – Match Outcome**



Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

**Polymarket – Player Performance**

## C. Kalshi and Polymarket's Sports-Related "Event Contracts" Resemble Traditional Gambling in Myriad Other Ways

64. Beyond the basics of allowing bettors to place wagers on the outcomes of games and individual player performances, Kalshi and Polymarket's sports-related "event contracts" resemble traditional sports betting in other significant ways that make their products function, look, and feel even more like gambling.

65. First, Kalshi and Polymarket each offer sports-related "event contracts" in forms that mimic traditional forms of sports betting.

66. These include the "moneyline" (which team wins the game) and the "over under" (whether the final combined score in a game will be higher or lower than the set line)—both of which the General Assembly specifically referenced when first defining the term "sports wagering" under Rhode Island law in 2018, *see* R.I. Gen. Laws § 42-61.2-1(39). They also include

18

the "point spread" (or "spread") (whether a team will win or lose by a certain number of points) as well as proposition (or "prop") bets (additional wagers that are independent of the outcome of the match, including individual player performances).

67. For example, in connection with the May 5, 2026 NBA playoff matchup between the Los Angeles Lakers and the Oklahoma City Thunder, Kalshi offered "event contracts" that were based on each of these traditional sports betting categories:

## Kalshi - Moneyline



## Kalshi – Point Spread



19

**Kalshi – Over-Under**



**Kalshi – "Prop" Bets (Player Points)**

68.     Polymarket offered the same traditional sports bets for the Lakers-Thunder matchup on its own platform:

20

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

## Polymarket – Moneyline, Point Spread, Over-Under



Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

**Polymarket – "Prop" Bets (Player Points)**



69.     These very same traditional sports bets on the Lakers-Thunder playoff matchup on May 5, 2026—the moneyline, point spread, over under, and a host of player "prop" bets—were also available to Rhode Island betters through the only state-operated, licensed, and approved online sports wagering platform, Sportsbook RI:

22

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

## Sportsbook RI – Moneyline, Point Spread, Over-Under



Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

## Sportsbook RI – "Prop" Bets (Player Points)



70.     Of course, any such bets placed through Sportsbook RI were subject to all applicable Rhode Island laws, including statutorily required revenue sharing (under which the state retains 51% of sports-wagering and online sports-wagering revenues), as well as RILOT rules and regulations, including its responsible gambling requirements.

71.     Kalshi and Polymarket maintain that the very same wagers—if placed on their platforms in the form of "event contracts," rather than as bets on betting slips—do not constitute sports wagering.

72.     Still other features of Defendants' platforms resemble traditional gambling and sports betting as well.  For instance, Kalshi and Polymarket allow users to create accounts, deposit funds into those accounts, and use account funds to wager on "event contracts", much as one would purchase "chips" to place bets at Twin River, or place bets on the Sportsbook RI app.  And any return on a successful wager will remain in a bettor's account on Kalshi or Polymarket until the bettor chooses to withdraw those funds—just as winnings from successful bets remain in a user's account until withdrawal on Sportsbook RI.

73.     Additionally, Kalshi operates an affiliated entity that functions much like the "house" would in a classic gambling operation, by acting as a "market maker."  Kalshi Trading LLC provides liquidity by placing both buy and sell orders for event contracts, ensuring that bettors can wager at nearly all times.  By taking opposing positions, Kalshi Trading LLC absorbs imbalances in bettor demand and profits from price movements.

74.     Likewise, Kalshi has an affiliated clearinghouse that finalizes and settles event contract wagers.  Kalshi Klear LLC is responsible for determining outcomes, issuing payouts, and processing the movement of funds between bettors once an event has "resolved."  It functions entirely within Kalshi's corporate structure and does not serve as an independent intermediary.  This arrangement allows Kalshi to control each stage of the wager: Kalshi writes the rules for the contract, determines the basis for settlement, and oversees the payment process.

75.     By using its own clearing agent, Kalshi reveals how such "prediction markets" are not merely third-party trading markets but rather closed-loop wagering operations that create the games, handle the bets, and pay the winners.

76.     By no coincidence, Kalshi and Polymarket employ additional design features that encourage impulsive engagement, exploit awards anticipation, and diminish users' perception of financial risk, via methods familiar in the gambling psychology literature.

77.     Kalshi, for example, bombards users with a constant flow of updates on what wagers other users are placing across the platform, a design mechanism known to trigger gambling behavior. Kalshi users see a flurry of bets in a live ticker-tape stream displayed prominently on its homepage, alongside lists of "Trending" and "Top Movers" wagers.

78.     Likewise, when Kalshi users are ready to place their own bets, they are prompted to pursue other contracts that "people are also trading."

79.     Kalshi further displays leaderboard rankings based on profits and volume on a daily, weekly, monthly, and all-time basis in a manner that promotes high-risk behavior and rewards betting success with community recognition. Certain leaderboards are time limited with a countdown clock to further increase pressure and encourage impulsive betting behaviors.

80.     Polymarket employes similar features on its platform.

81.     These updates, prompts, and leaderboards are all examples of mechanisms that behavioral scientists have long associated with addictive gambling behaviors, as observed with slot machines and other traditional gambling methods.

82.     There is only one conclusion to be drawn from these similarities: Kalshi and Polymarket function, look, and feel like gambling because they *are* gambling. As such, they are rightly subject to Rhode Island's gambling laws.

**D.     Kalshi and Polymarket Have Described Their "Event Contracts" As "Bets"**

83.     Kalshi and Polymarket have even repeatedly made public statements referring to the sports-related "event contracts" on their platforms as "bets."

26

84.    Prior to April 2026, Kalshi constantly referred to itself in advertisements as a "sports betting platform" that offered "bets" on various real-world events.

85.    Kalshi's own "Press" page on its website still includes various news stories where Kalshi and its CEO refer to its offerings as "bets."[16]

86.    Kalshi has also argued in federal court that sports-related event contracts are "gaming," that "'gaming' (in the sense of betting on games) is a form of 'gambling,'" and that such activities belong in the same category as "casino gambling."  Appellee's Br. 41, 47, 50, *KalshiEx LLC v. Commodity Futures Trading Comm.*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024).

87.    Similarly, in past X (formerly Twitter) advertisements, Polymarket claimed that "[l]egal sports betting on the world's largest prediction market is coming to all 50 states."

88.    Polymarket has made similar statements elsewhere. For example, on its website, under the heading "What is Polymarket?," Polymarket says that it offers "betting on future events across various topics."[17]

89.    Likewise, on its website's FAQ page, Polymarket defines "a prediction market as a platform where people can *bet* on the outcome of future events."[18]

90.    User comments on Kalshi and Polymarket's sports-related "event contracts" frequently refer to the purchasing of such "event contracts" as "bets," revealing that Defendants' own customers, much like Defendants themselves, recognize that "trading" sports-related "event contracts" on "prediction markets" is simply another form of sports betting.

---

[16] https://news.kalshi.com/press
[17] https://help.polymarket.com/en/articles/13364060-what-is-polymarket
[18]    https://help.polymarket.com/en/articles/13364272-what-is-a-prediction-market    (emphasis added).

27

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

## KALSHI AND POLYMARKET ASSERT THAT THEY OPERATE LEGALLY IN R.I.

91.     Even though Kalshi and Polymarket operate completely independent of the state-run operations at Twin River, and outside of RILOT's regulation and control—in other words, in total defiance of Rhode Island's existing legal framework for permissible gambling in the state—Kalshi and Polymarket publicly maintain that their platforms are "legally" available to Rhode Islanders.

92.     This presents an actual controversy between the State and the Defendants that is ripe for adjudication under the Uniform Declaratory Judgments Act.

93.     For example, Kalshi has repeatedly and widely publicized the purported legality of its "event contracts" through its mobile app, website, social media, and other forms of advertising.

94.     Kalshi's "App Store" thumbnails (i.e., small images featuring the app) have made statements such as "legal in all 50 states."

95.     Kalshi's Instagram profile currently states that users can "[t]rade on anything in all 50 states: politics, sports, entertainment, crypto, weather, and so much more."

96.     Likewise, the KalshiSports Instagram profile currently reads, "[t]rade on anything in all 50 states: baseball, football, basketball, and so much more."

97.     On January 24, 2025, the KalshiNews blog announced the headline, "Game on: Kalshi brings 100% legal trading to all 50 states." [19]

98.     Polymarket has repeatedly made similar statements on its mobile app, website, social media, and other forms of advertising.

99.     For instance, a September 3, 2025, Polymarket advertisement on X claims that "Legal sports betting on the world's largest prediction market is coming to all 50 states."

---

[19] https://news.kalshi.com/p/game-on-kalshi-sports-trading-is-now-100-legal-in-all-50-states-2

100.    In a Facebook advertisement around September 20, 2025, Polymarket claimed: "Polymarket is coming home," and that it "delivers the biggest payouts, instant cashout, and full access across all 50 states."

101.    In similar Facebook advertisements in January and February 2026, Polymarket advertised that users can "Trade Legally in All 50 States."

102.    Though Polymarket's website states that it is "not available to . . . persons located in the United States," users are able to access the U.S. version of Polymarket by signing up for an account through its mobile app.  On its United States-based website, https://polymarket.com/usa, Polymarket advertises that "Polymarket is back" and offers users the chance to join a waitlist: "Polymarket's U.S. app is now being rolled out to those on the waitlist.  Provide your phone number to secure your spot & be notified when it's your turn."

## KALSHI AND POLYMARKET'S SPORTS-RELATED "EVENT CONTRACTS" MEET RHODE ISLAND LEGAL DEFINITIONS FOR GAMBLING

103.    Kalshi and Polymarket facilitate gambling (specifically sports wagering) in Rhode Island by allowing bettors to place wagers on the outcome of sports matches and individual player performances, under the guise of "trading" "event contracts" on "prediction markets."

104.    These "event contracts" are, in all relevant respects, identical to the sports wagers that eligible Rhode Islanders may legally place either in person through the sportsbook at Twin River, or online through Sportsbook RI.

105.    By facilitating the same kinds of sports wagering in Rhode Island on their platforms, Kalshi and Polymarket render themselves subject to Rhode Island's gambling laws and regulations.

106.    Even though Defendants' sports-related "event contracts" amount to sports wagering, Defendants operate in Rhode Island outside of the State's control and in the absence of

29

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

the requisite voter approvals, in violation of Sections 15 and 22 of Article 6 of the Rhode Island Constitution.

107. Kalshi and Polymarket's sports-related "event contracts" likewise qualify as "casino gaming" as that term is defined in § 42-61.2-1(2). "Casino gaming" in Rhode Island includes any "game or device included within the definition of Class III gaming as that term is defined Section 2703(8) of Title 25 of the United States Code[.]" *Id.* As our Superior Court has already recognized, "sports wagering is a type of Class III gaming." *Harrop*, PC-2019-5273, 2020 WL 3033494, at *8 (citing 25 C.F.R. § 502.4).

108. Since the establishment of "casino gaming" in Rhode Island, the General Assembly has specified—and Rhode Island voters have repeatedly confirmed in state and local referenda—that all such "casino gaming" is limited to the state-run operations at Twin River, subject to RILOT's "full operational control." Kalshi and Polymarket currently offer sports wagering to Rhode Islanders entirely independent of Twin River and RILOT, defying Rhode Island law and the will of Rhode Island voters.

109. Likewise, by offering to Rhode Islanders sports-related "event contracts" on "prediction markets," Kalshi and Polymarket are engaged in "online sports wagering" under R.I. Gen. Laws § 42-61.2-1(27). Specifically, Kalshi and Polymarket facilitate "the act of sports wagering by the placing of wagers on sporting events" as well as "individual performance statistics of athletes in a sporting event, over the internet through computers" and "mobile applications on mobile devices[.]" *Id.*

110. But neither Kalshi nor Polymarket possesses a license or contract from RILOT to offer such "online sports wagering" to Rhode Islanders.

30

111.    Furthermore, by facilitating sports wagering in Rhode Island outside of the state's legal framework, and in the absence of a contract or license from RILOT, Kalshi and Polymarket are also in violation of R.I. Gen. Laws § 42-61.3-2(b)(18), among other state criminal laws that target unlawful gambling operations.

## PRAYER FOR RELIEF

WHEREFORE, the State respectfully requests that the Court grant the following relief under its authority granted by the Uniform Declaratory Judgments Act, R.I. Gen. Laws § 9-30-1, *et seq.*:

112.    Determine and declare, as a matter of law, that Defendants' offering of sports-related "event contracts" is subject to the constitutional requirements of R.I. Const. art. 6 §§ 15 and 22;

113.    Determine and declare, as a matter of law, that Defendants' offering of sports-related "event contracts" constitutes "casino gaming" as defined by R.I. Gen. Laws § 42-61.2-1(2);

114.    Determine and declare, as a matter of law, that Defendants' offering of sports "event contracts" constitutes "online sports wagering" as defined by R.I. Gen. Laws § 42-61.2-1(27);

115.    Determine and declare, as a matter of law, that "casino gaming" and "online sports wagering" in the State of Rhode Island are restricted to the operations under the full operational control and regulation of RILOT, as set out in R.I. Gen. Laws §§ 42-61.2-2.1, -2.2, and -2.3;

116.    Determine and declare, as a matter of law, that Defendants' operations in Rhode Island constitute unauthorized gambling in violation of R.I. Gen. Laws §§ 42-61.2-2.1, -2.2, and -2.3;

117.    Permanently enjoin Defendants from offering sports-related "event contracts" on "prediction markets" within the State of Rhode Island;

118.    Require restitution and disgorgement;

31

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

119.    Such other and further relief as this Court deems just and equitable in accordance

with the facts of this case.


Dated: May 21, 2026                          Respectfully submitted,

                                             THE STATE OF RHODE ISLAND

                                             PETER F. NERONHA
                                             RHODE ISLAND ATTORNEY GENERAL

                                             By its attorneys:

                                             */s/ Patrick J. Dolan*
                                             */s/ Paul T.J. Meosky*
                                             */s/ Michael B. Collins*
                                             Patrick J. Dolan (#10462)
                                             Paul T.J. Meosky (#10742)
                                             Michael B. Collins (#11176)
                                             Special Assistant Attorneys General
                                             150 South Main Street
                                             Providence, RI 02903
                                             (401) 274-4400
                                             pdolan@riag.ri.gov
                                             pmeosky@riag.ri.gov
                                             mcollins@riag.ri.gov

32

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

**STATE OF RHODE ISLAND SUPERIOR COURT PROVIDENCE COUNTY**

| | |
|---|---|
| THE STATE OF RHODE ISLAND by and through ATTORNEY GENERAL PETER F. NERONHA,<br><br>   *Plaintiff*,<br><br>     v.<br><br>KALSHIEX LLC;<br>QCX LLC d/b/a POLYMARKET US,<br><br>   *Defendants*. | Superior Court for the State of Rhode Island, Providence County, Case No. PC-2026-2753<br><br>**NOTICE OF FILING NOTICE OF REMOVAL OF CIVIL ACTION TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND** |

Please take notice that on May 22, 2026, Defendant QCX LLC d/b/a POLYMARKET US, with the consent of Defendant KALSHIEX LLC, filed in the United States District Court for the District of Rhode Island a Notice of Removal in accordance with 28 U.S.C. §§ 1331, 1441(a), 1442(a), and 1446.

A true and correct copy of the Notice of Removal is attached hereto as Exhibit 1.  The Providence County Superior Court of the State of Rhode Island is hereby requested to proceed no further with this matter unless the case is remanded.

1

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

Dated: May 22, 2026

Respectfully submitted,

/s/ Matthew H. Parker
WHELAN CORRENTE & FLANDERS LLP

Matthew H. Parker (#8111)
100 Westminster Street, Suite 710
Providence, RI 02903
Telephone: 401.270.4500
Fax: 401.270.3760
mparker@whelancorrente.com

Orin Snyder*
Matt Benjamin*
Amanda LeSavage*
GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene*
GIBSON DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

*Applications for pro hac vice forthcoming

Attorneys for Defendant QCX LLC d/b/a
Polymarket US

2

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

## CERTIFICATION OF SERVICE

I hereby certify that on the 22nd day of May 2026, I filed and served this document through

the electronic filing system upon the following:

Peter Neronha
Attorney General of Rhode Island
Patrick J. Dolan
Paul T.J. Meosky
Michael B. Collins
Special Assistant Attorneys General
150 South Main Street
Providence, RI 02903
Telephone: 401.274.4400
pdolan@riag.ri.gov
pmeosky@riag.ri.gov
mcollins@riag.ri.gov

The document electronically filed and served is available for viewing and/or downloading

from the Rhode Island Judiciary's Electronic Filing System.

*/s/ Matthew H. Parker*

3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

THE STATE OF RHODE ISLAND by and through ATTORNEY GENERAL PETER F. NERONHA,

        *Plaintiff*,

        v.

KALSHIEX LLC.;
QCX LLC d/b/a POLYMARKET US,

        *Defendants*.

Case No.: _____

---

## CONSENT TO REMOVAL

---

The undersigned counsel, on behalf of Defendant KalshiEX LLC ("Consenting Defendant"), hereby consent to the removal of this action from Rhode Island Superior Court – Providence County to the United States District Court for the District of Rhode Island.

DATED: May 22, 2026

        KALSHIEX LLC,

        By their Attorneys

        */s/ Ryan M. Gainor*
        Ryan M. Gainor (#9353)
        Mackenzie C. McBurney (#10098)
        Hinckley, Allen & Snyder LLP
        100 Westminster Street, Suite 1400
        Providence, RI  02903-2319
        T:  (401) 274-2000
        F:  (401) 277-9600
        rgainor@hinckleyallen.com
        mmcburney@hinckleyallen.com

        and

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
Colleen Roh Sinzdak (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
Matthew J. Laroche (*pro hac vice* forthcoming)
Nicole D. Valente (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Defendant KalshiEX, LLC*

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

Case 1:26-cv-00333-MSM-PAS   Document 1-4   Filed 05/22/26   Page 65 of 105 PageID #: 151

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

State of Rhode Island

**DEFENDANTS**

KalshiEX LLC; QCX LLC d/b/a Polymarket US

**(b)** County of Residence of First Listed Plaintiff   Providence County, RI
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attachment

Attorneys *(If Known)*

See attachment

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty
**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### INTELLECTUAL PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [x] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [x] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 1331, 1441, 1442(a)(1); 7 U.S.C. § 1 et seq.

Brief description of cause:
Plaintiff asserts a claim for declaratory and injunctive relief based on alleged violations of Rhode Island gaming law.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes  [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Hon. Mary S. McElroy            DOCKET NUMBER   26-cv-00327

DATE

May 22, 2026

SIGNATURE OF ATTORNEY OF RECORD

Matthew H. Parker

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/22/2026 9:33 PM
Envelope: 5679208
Reviewer: Alexandra R.

## Attachment to Civil Cover Sheet

**Section 1(c), continued:**

Peter Neronha
Attorney General of Rhode Island
Patrick J. Dolan
Paul T.J. Meosky
Michael B. Collins
Special Assistant Attorneys General
150 South Main Street
Providence, RI 02903
Tel: 401.274.4400
pdolan@riag.ri.gov
pmeosky@riag.ri.gov
mcollins@riag.ri.gov

*Attorneys for the State of Rhode Island*

Matthew H. Parker (#8111)
WHELAN CORRENTE & FLANDERS LLP
100 Westminster Street, Suite 710
Providence, RI 02903
Tel: 401.270.4500
Fax: 401.270.3760
mparker@whelancorrente.com

Orin Snyder*
Matt Benjamin*
Amanda LeSavage*
GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene*
1700 M Street, N.W. Washington, D.C. 20036
Tel: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

*Attorneys for QCX LLC d/b/a Polymarket US*

*\*Applications for pro hac vice forthcoming*



# STATE OF RHODE ISLAND JUDICIARY

## SUPERIOR COURT

### SUMMONS

| | |
|---|---|
| | **Civil Action File Number**<br>PC-2026-02753 |
| **Plaintiff**<br>THE STATE OF RHODE ISLAND by and through ATTORNEY GENERAL PETER F. NERONHA<br> v.<br>KALSHIEX LLC et al.<br>**Defendant** | **Attorney for the Plaintiff or the Plaintiff**<br>Paul Timothy James Meosky<br>**Address of the Plaintiff's Attorney or the Plaintiff**<br>150 South Main Street<br>Providence RI  02903 |
| Licht Judicial Complex<br>Providence/Bristol County<br>250 Benefit Street<br>Providence RI  02903<br>(401) 222-3250 | **Address of the Defendant**<br>No Known Address |

## TO THE DEFENDANT, KALSHIEX LLC:

The above-named Plaintiff has brought an action against you in said Superior Court in the county indicated above. You are hereby summoned and required to serve upon the Plaintiff's attorney, whose address is listed above, an answer to the complaint which is herewith served upon you within twenty (20) days after service of this Summons upon you, exclusive of the day of service.

If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.  Your answer must also be filed with the court.

As provided in Rule 13(a) of the Superior Court Rules of Civil Procedure, unless the relief demanded in the complaint is for damage arising out of your ownership, maintenance, operation, or control of a motor vehicle, or unless otherwise provided in Rule 13(a), your answer must state as a counterclaim any related claim which you may have against the Plaintiff, or you will thereafter be barred from making such claim in any other action.

| | |
|---|---|
| This Summons was generated on 5/22/2026. | /s/ Stephen Burke<br>Clerk |

Witness the seal/watermark of the Superior Court

SC-CMS-1 (revised November 2022)



# STATE OF RHODE ISLAND JUDICIARY

## SUPERIOR COURT

| | |
|---|---|
| **Plaintiff**<br>THE STATE OF RHODE ISLAND by and through ATTORNEY GENERAL PETER F. NERONHA<br>  v.<br>KALSHIEX LLC et al.<br>**Defendant** | **Civil Action File Number**<br>PC-2026-02753 |

## PROOF OF SERVICE

I hereby certify that on the date below I served a copy of this Summons, complaint, Language Assistance Notice, and all other required documents received herewith upon the Defendant, KALSHIEX LLC, by delivering or leaving said papers in the following manner:

☐ With the Defendant personally.

☐ At the Defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person of suitable age and discretion _____
Address of dwelling house or usual place of abode _____
_____
Age _____
Relationship to the Defendant _____

☐ With an agent authorized by appointment or by law to receive service of process.
Name of authorized agent _____
If the agent is one designated by statute to receive service, further notice as required by statute was given as noted below.
_____

☐ With a guardian or conservator of the Defendant.
Name  of person and designation _____

☐ By delivering said papers to the attorney general or an assistant attorney general if serving the state.

☐ Upon a public corporation, body, or authority by delivering said papers to any officer, director, or manager.
Name  of person and designation _____

Page 1 of 2

SC-CMS-1 (revised November 2022)



# STATE OF RHODE ISLAND JUDICIARY

## SUPERIOR COURT

Upon a private corporation, domestic or foreign:

☐ By delivering said papers to an officer or a managing or general agent.

  Name of person and designation _____

☐ By leaving said papers at the office of the corporation with a person employed therein.

  Name of person and designation _____

☐ By delivering said papers to an agent authorized by appointment or by law to receive service of process.

  Name of authorized agent _____

  If the agent is one designated by statute to receive service, further notice as required by statute was given as noted below.

  _____

☐ I was unable to make service after the following reasonable attempts: _____

_____

| SERVICE DATE: _____/_____/_____ <br> Month   Day   Year | SERVICE FEE $_____ |
|---|---|

Signature of SHERIFF or DEPUTY SHERIFF or CONSTABLE

SIGNATURE OF PERSON OTHER THAN A SHERIFF or DEPUTY SHERIFF or CONSTABLE MUST BE NOTARIZED.

_____

 Signature

State of _____

County of _____

  On this _____ day of _____, 20____, before me, the undersigned notary public, personally appeared _____ ☐ personally known to the notary or ☐ proved to the notary through satisfactory evidence of identification, which was _____, to be the person who signed above in my presence, and who swore or affirmed to the notary that the contents of the document are truthful to the best of his or her knowledge.

Notary Public: _____

My commission expires: _____

Notary identification number: _____

Page 2 of 2

SC-CMS-1 (revised November 2022)



# STATE OF RHODE ISLAND JUDICIARY

## SUPERIOR COURT

### SUMMONS

| | |
|---|---|
| | **Civil Action File Number**<br>PC-2026-02753 |
| **Plaintiff**<br>THE STATE OF RHODE ISLAND by and through ATTORNEY GENERAL PETER F. NERONHA<br> v.<br>KALSHIEX LLC et al.<br>**Defendant** | **Attorney for the Plaintiff or the Plaintiff**<br>Paul Timothy James Meosky |
| | **Address of the Plaintiff's Attorney or the Plaintiff**<br>150 South Main Street<br>Providence RI  02903 |
| Licht Judicial Complex<br>Providence/Bristol County<br>250 Benefit Street<br>Providence RI  02903<br>(401) 222-3250 | **Address of the Defendant**<br>No Known Address |

## TO THE DEFENDANT, QCX, LLC d/b/a POLYMARKET US:

The above-named Plaintiff has brought an action against you in said Superior Court in the county indicated above. You are hereby summoned and required to serve upon the Plaintiff's attorney, whose address is listed above, an answer to the complaint which is herewith served upon you within twenty (20) days after service of this Summons upon you, exclusive of the day of service.

If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.  Your answer must also be filed with the court.

As provided in Rule 13(a) of the Superior Court Rules of Civil Procedure, unless the relief demanded in the complaint is for damage arising out of your ownership, maintenance, operation, or control of a motor vehicle, or unless otherwise provided in Rule 13(a), your answer must state as a counterclaim any related claim which you may have against the Plaintiff, or you will thereafter be barred from making such claim in any other action.

| | |
|---|---|
| This Summons was generated on 5/22/2026. | /s/ Stephen Burke<br>Clerk |

Witness the seal/watermark of the Superior Court

SC-CMS-1 (revised November 2022)



# STATE OF RHODE ISLAND JUDICIARY

## SUPERIOR COURT

| **Plaintiff** | **Civil Action File Number** |
|---|---|
| THE STATE OF RHODE ISLAND by and through ATTORNEY GENERAL PETER F. NERONHA<br> v.<br>KALSHIEX LLC et al.<br>**Defendant** | PC-2026-02753 |

## PROOF OF SERVICE

I hereby certify that on the date below I served a copy of this Summons, complaint, Language Assistance Notice, and all other required documents received herewith upon the Defendant, QCX, LLC d/b/a POLYMARKET US, by delivering or leaving said papers in the following manner:

☐ With the Defendant personally.

☐ At the Defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
   Name of person of suitable age and discretion _____
   Address of dwelling house or usual place of abode _____
   _____
   Age _____
   Relationship to the Defendant _____

☐ With an agent authorized by appointment or by law to receive service of process.
   Name of authorized agent _____
   If the agent is one designated by statute to receive service, further notice as required by statute was given as noted below.
   _____

☐ With a guardian or conservator of the Defendant.
   Name of person and designation _____

☐ By delivering said papers to the attorney general or an assistant attorney general if serving the state.

☐ Upon a public corporation, body, or authority by delivering said papers to any officer, director, or manager.
   Name of person and designation _____

Page 1 of 2

SC-CMS-1 (revised November 2022)



# STATE OF RHODE ISLAND JUDICIARY

## SUPERIOR COURT

Upon a private corporation, domestic or foreign:

☐ By delivering said papers to an officer or a managing or general agent.

Name of person and designation _____

☐ By leaving said papers at the office of the corporation with a person employed therein.

Name of person and designation _____

☐ By delivering said papers to an agent authorized by appointment or by law to receive service of process.

Name of authorized agent _____

If the agent is one designated by statute to receive service, further notice as required by statute was given as noted below.

_____

☐ I was unable to make service after the following reasonable attempts: _____

_____

SERVICE DATE: _____/_____/_____        SERVICE FEE $_____
              Month  Day   Year

Signature of SHERIFF or DEPUTY SHERIFF or CONSTABLE

SIGNATURE OF PERSON OTHER THAN A SHERIFF or DEPUTY SHERIFF or CONSTABLE MUST BE NOTARIZED.

_____
Signature

State of _____

County of _____

On this _____ day of _____, 20_____, before me, the undersigned notary public, personally appeared _____ ☐ personally known to the notary or ☐ proved to the notary through satisfactory evidence of identification, which was _____, to be the person who signed above in my presence, and who swore or affirmed to the notary that the contents of the document are truthful to the best of his or her knowledge.

Notary Public: _____

My commission expires: _____

Notary identification number: _____

Page 2 of 2

SC-CMS-1 (revised November 2022)

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

STATE OF RHODE ISLAND                                    SUPERIOR COURT
PROVIDENCE COUNTY

---

THE STATE OF RHODE ISLAND by and
through ATTORNEY GENERAL PETER F.
NERONHA,

　　　　　　　　*Plaintiff,*

v.                                                       C.A. No. PC-2026-

KALSHIEX LLC.; QCX, LLC d/b/a
POLYMARKET US

　　　　　　　　*Defendants*.

---

## PETITION FOR DECLARATORY JUDGMENT

Pursuant to R.I. Gen. Laws § 9-30-1 et seq., R.I. Super. Ct. R. Civ. P. 57, and the legal and equitable powers of this Court, the State of Rhode Island, by and through Attorney General Peter F. Neronha, petitions this Court for a declaration confirming that by offering to Rhode Islanders sports-related "event contracts" on "prediction markets," Kalshi and Polymarket are facilitating gambling that is subject to Rhode Island's constitutional, statutory, and regulatory requirements.

## INTRODUCTION

1.　　Under the Tenth Amendment to the Constitution of the United States, the individual states possess general police powers to protect the health, safety, welfare, and morals of their citizens.

2.　　Historically and through the present, state regulation of gambling—traditionally defined as any activity involving the elements of consideration, chance, and prize—is one

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

straightforward example of the exercise of state police power, as has been repeatedly and consistently recognized by state and federal courts in Rhode Island and elsewhere.[1]

3.      State regulation of gambling serves a number of compelling public interests, including revenue generation, protecting consumers from fraud, and safeguarding vulnerable populations, such as minors and those susceptible to addiction, from the risks of problem gambling by ensuring the existence of appropriate controls.

4.      In Rhode Island, gambling, including sports betting, is subject to layers of constitutional, statutory, and regulatory restrictions and safeguards, through which the State itself retains and exercises operational control over permissible gambling operations.[2]

5.      At present, with few limited exceptions, legal gambling in Rhode Island is operated by the State principally through the State licensed and operated casinos at Bally's Twin River in Lincoln Casino Resort in Lincoln, RI and Bally's Tiverton Casino and Hotel in Tiverton, RI (collectively, "Twin River"), under the chief regulatory authority of the State Lottery Division ("Rhode Island Lottery" or "RILOT").  Since 2018, when states recovered the ability to legalize and regulate sports betting at the state level, this has included all wagering on sports.

6.      In 2019, the General Assembly further authorized RILOT to operate and regulate "online sports wagering," defined as "the placing of wagers" on sports events or individual athletic

---

[1] *See, e.g., In re Advisory Opinion to Governor*, 856 A.2d 320, 323 (R.I. 2004) ("the General Assembly has plenary power to legislate on all matters pertaining to gambling in this state"); *Allendale Leasing, Inc. v. Stone*, 614 F. Supp. 1440, 1454 (D.R.I. 1985) ("It cannot be gainsaid that a state government may lawfully prohibit gambling in the exercise of its police power"); *Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905) (Regulation of gambling is "concededly within the police powers of a state").

[2] *See Harrop v. The Rhode Island Div. of Lotteries*, PC-2019-5273, 2020 WL 3033494, at *8 (R.I. Super. Ct. June 01, 2020) (J. Stern) (finding "that sports wagering is a type of Class III gaming, Class III gaming is a form of casino gaming, and through the Casino Gaming Acts, the voters approved casino gaming").

2

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 76 of 105 PageID #: 162

performance online or through RILOT-approved mobile applications ("apps").  R.I. Gen. Laws § 42-61.2-1(27).

7.    Since that time, the exclusive State-approved platform for online sports wagering in Rhode Island is Sportsbook Rhode Island® ("Sportsbook RI").  Bets placed through Sportsbook RI are, like all other forms of permitted gambling in Rhode Island, subject to the State's operational decisions, the State's allocation of revenue to the State's selected vendors, RILOT's rules and regulations, and all other applicable Rhode Island legal requirements.

8.    Recently, however, non-resident Defendants Kalshi and Polymarket ("Defendants") have begun to advertise and offer to Rhode Islanders a form of betting completely outside of the State's tightly-regulated gambling framework: so-called "event contracts" on "prediction markets."[3]

9.    Online and through their apps, Kalshi and Polymarket allow Rhode Islanders to place wagers on the outcome of real-world events, including sports matches, with those who guess (or predict) the correct outcomes winning monetary awards.  Bearing the classic hallmarks of consideration (the wager), chance (the "prediction" or bet), and prize (the award)—not to mention a host of other features designed to resemble a sportsbook—Kalshi and Polymarket's sports-related "event contracts" are no different from traditional sports betting.

10.    Kalshi and Polymarket, however, lack any of the necessary prerequisites to carrying out a legal gambling operation in Rhode Island—such as the constitutionally-mandated voter approvals and the required relationship with the Rhode Island Lottery, including but not limited to

---

[3] The State uses the term "event contract" throughout this complaint to refer to the wagers that Defendants advertise and make available to Rhode Islanders through their platforms, even though Defendants may at times refer to their offerings by other names, such as "shares," "futures," "swaps," or "derivatives."

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 77 of 105 PageID #: 163

a license and State oversight by the Rhode Island Lottery. Ignoring these requirements, Kalshi and Polymarket maintain through both their actions and public statements that their platforms are "legally" available to Rhode Islanders.

11. Through this action, the State seeks a ruling from the Court confirming that Kalshi and Polymarket's sports-related "event contracts" are indeed subject to Rhode Island's constitutional, statutory, and regulatory restrictions on gambling.

## PARTIES

12. Plaintiff is the State of Rhode Island, represented by Attorney General Peter F. Neronha, who brings this action as the State's chief law enforcement officer and attorney for the State in accordance with his constitutional, statutory, and common law authority.

13. Defendant KalshiEX LLC ("Kalshi") is a Delaware limited liability company with its principal place of business in New York, New York. Kalshi is a wholly owned subsidiary of Kalshi Inc. Through its website and mobile application ("app"), Kalshi offers sports-related "event contracts" on a "prediction market" to Rhode Island residents.

14. Defendant QCX LLC d/b/a Polymarket US ("Polymarket") is a Delaware limited liability company with its principal place of business in New York, New York. Through its website and mobile app, Polymarket offers sports-related "event contracts" on a "prediction market" to Rhode Island residents.

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction over this case under the Uniform Declaratory Judgments Act, R.I. Gen. Laws § 9-30-1 *et seq.*

16. The Court has personal jurisdiction over non-resident Defendants under R.I. Gen. Laws § 9-5-33(a) because, among other things, Defendants advertise and offer to Rhode Islanders sports-related "event contracts" on "prediction markets."

4

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

17.     Venue in this Court is proper as the State is the plaintiff and has its principal offices in Providence County.  R.I. Gen. Laws § 9-4-3.

## THE STATE'S CONSTITUTIONAL AND STATUTORY AUTHORITY TO OPERATE AND REGULATE GAMBLING

**A.     Rhode Island's Well-Established Legal Framework for Permissible Gambling**

18.     The prohibition and regulation of gambling stands at the heart of the State's historic police powers and its fundamental duty to protect the health, welfare, safety, and morals of its citizens.

19.     The history of state regulation over gambling predates our nation's founding.  In 1638, for example, the Massachusetts Bay Colony enacted idleness laws that barred people from possessing cards, dice, or other gambling devices.  George C. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch. & Rev. J. 65, 66 (1996).

20.     By the time of the American Revolution, the colonies sought to regulate gambling as a matter of wartime civic virtue.  In October 1774, in response to the punitive "Intolerable Acts" imposed on the colonies by the British, the First Continental Congress (to which Rhode Island belonged) adopted the Articles of Association, which, in addition to embracing a boycott of British goods and an end to the slave trade, pledged to "discountenance and discourage every species of extravagance and dissipation, especially all horse-racing and all kinds of games, cock fighting," and other activities.

21.     Rhode Island soon followed with an early form of our centuries-old tradition of state prohibition and regulation of gambling: in 1777, the General Assembly passed an "Act to Prevent Horse Racing," which provided for the forfeiture of horses used in races and authorized proceedings by information.  *See* 1777 R.I. Acts & Resolves 7 (Sept. Adjourned Session).

5

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 79 of 105 PageID #: 165

22.     To this day, the same basic exercise of the state's police power over gambling is reflected in several provisions of the Rhode Island Constitution.

23.     Since its ratification in 1842, the Rhode Island Constitution has contained a broad prohibition on all "lotteries" in the state.  In 1973, the General Assembly amended that provision—what is now Article 6, Section 15—to specifically allow only "lotteries operated by the state" and "those previously permitted by the general assembly prior to the adoption of this section," and subjected them "to the proscription and regulation of the general assembly."  As a result of this amendment, in 1974, the General Assembly passed legislation creating RILOT and the Rhode Island Lottery.[4]  R.I. Gen. Laws § 42-61-1 *et seq.*

24.     The Supreme Court of Rhode Island has interpreted Article 6, Section 15 broadly to extend to any "scheme or plan having three essential elements: consideration, chance, and prize."  *In re Advisory Opinion to the Governor*, 856 A.2d 320, 327 (R.I. 2004) (quoting *Roberts v. Comms. Investment Club of Woonsocket*, 431 A.2d 1206, 1211 (R.I. 1981)).  Under this section, it is illegal for non-state actors to operate any "scheme or plan" that rewards bets or wagers placed on outcomes determined primarily by chance.

25.     Article 6, Section 22 of the Rhode Island Constitution, first enacted in 1994 and later amended in 2014, additionally requires statewide and local referenda before expanding "the types or locations of gambling" within the State.

26.     The Supreme Court of Rhode Island has interpreted the Constitution's term "gambling" even more broadly than "lottery," explaining that "gambling" includes bets or wagers

---

[4] Between 1842 and 1974, Rhode Island maintained a near-total prohibition on state-sanctioned gaming.  This restriction was partially lifted in 1934, when Rhode Island voters approved a measure to legalize pari-mutuel betting, which first extended to horse racing at Narragansett Park in Pawtucket, and later to dog racing in Lincoln and jai alai in Newport.

6

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 80 of 105 PageID #: 166

on activities that depend primarily on skill or judgment, *as well as* lotteries, which depend primarily on chance. *In re Advisory Opinion*, 856 A.2d at 333-34. In other words, whether bettors are wagering on games of chance or skill, the Rhode Island Constitution mandates that they may do so legally in Rhode Island only upon the approval of Rhode Island voters in state and local referenda.

27.      The General Assembly, exercising its plenary authority to regulate gambling, has enacted a statutory scheme authorizing and outlawing certain gambling activities in the state, including in our criminal code. Under that scheme, it is a felony to offer any form of gambling beyond those authorized in Chapter 19 of Title 11 (the "Gambling and Lotteries" chapter of Rhode Island's criminal code) or Chapters 61 (establishing the State Lottery) or 61.2 (the Casino Gaming Acts) of Title 42. R.I. Gen. Laws § 11-19-1.

28.      Likewise, the General Assembly has deemed it a crime punishable by up to a year in prison to engage (except as permitted under the state's pari-mutuel betting system or authorized by the Rhode Island Lottery) in "pool selling or bookmaking," or (among other activities) to "record or register bets or wagers . . . upon the result of any trial or contest of skill, speed, or power of endurance of man or beast, or upon the result of any political nomination, appointment, or election . . . or [to] keep, exhibit, or employ any device or apparatus for the purpose of recording bets or wagers . . . or [to] receive, register, record, forward . . . within or outside this state, any money, thing, or consideration of value bet or wagered . . . upon the speed or endurance of any man or beast[.]" *Id.*, § 11-19-14.

29.      In 2011, the General Assembly significantly expanded legal gambling in Rhode Island when it authorized "state-operated casino gaming" at Twin River-Lincoln, conditioned on

7

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 81 of 105 PageID #: 167

the voter-approval requirements of Article 6, Section 22, and subject to the state's "full operational control" through RILOT, in satisfaction of Article 6, Section 15. *Id.* § 42-61.2-2.1.

30.     The General Assembly defined "casino gaming" broadly to include "any and all table and casino-style games . . . or any other game or device included within the definition of Class III gaming as that term is defined in Section 2703(8) of Title 25 of the United States Code." *Id.*, § 42-61.2-1(2).

31.     Rhode Island courts have recognized that Class III gaming is a "catchall phrase" that encompasses all forms of gambling that are not "social and traditional games played for prizes of minimal value" (Class I) or "bingo-like games" (Class II). *Harrop v. Rhode Island Div. of Lotteries*, PC-2019-5273, 2020 WL 3033494, at *8 (R.I. Super. Ct. June 1, 2020) (Stern, J.) (quoting *In re Advisory Opinion*, 956 A.2d at 329 n.4).

32.     The 2011 Twin River-Lincoln statute was subsequently approved by Rhode Island voters in state and local referenda in 2012.

33.     The next year, in 2013, the General Assembly established a criminal law enforcement structure specifically for "casino gaming," by creating the Gaming Enforcement Unit of the Rhode Island State Police, R.I. Gen. Laws § 42-61.3-1, and granting it the authority to "monitor and investigate criminal violations relating to casino gaming activities consistent with chapter 61.3," *Id.*, § 42-61.2-2.1(f).

34.     In addition to a host of new criminal prohibitions intended to prevent cheating and protect the basic integrity of "casino gaming" in Rhode Island, the General Assembly declared it a felony to "[c]onduct a gaming operation, or attempt to conduct a gaming operation, where wagering is used . . . without a licensed issued by . . . [RILOT]." *Id.* § 42-61.3-2(b)(18). "Gaming operation" in this context refers to "casino gaming" as defined in § 42-61.2-1. "'Wager' means a

8

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 82 of 105 PageID #: 168

sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." *Id.*, § 42-61.3-2(a)(7).

35.    In 2016, the General Assembly authorized (and Rhode Island voters subsequently approved) the expansion of "state-operated casino gaming" to Twin River in Tiverton, again subject to RILOT's "full operational control." R.I. Gen. Laws § 42-61.2-2.3.

**B.    Sports Betting Must Be State-Operated and—Like All Other Forms of Permissible Gambling in Rhode Island—Is Subject to Strict State Control**

36.    In May 2018, the Supreme Court of the United States struck down as unconstitutional the Professional and Amateur Sports Protection Act (PASPA), the federal statute that had prohibited states from authorizing sports betting. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018).

37.    Just a month later, the General Assembly passed legislation that legalized sports betting in Rhode Island and brought it within the State's existing operational and regulatory framework. Specifically, the General Assembly authorized RILOT to "implement, operate, conduct, and control sports wagering at" Twin River, once more with "full operational control" vested in RILOT. R.I. Gen. Laws § 42-61.2-2.4.

38.    The General Assembly broadly defined sports wagering as "the business of accepting wagers on sporting events or a combination of sporting events, or on the individual performance statistics of athletes in a sporting event or combination of sporting events, by any system or method of wagering. The term includes, but is not limited to, exchange wagering, parlays, over-under, moneyline, pools, and straight bets, and the term includes the placement of such bets and wagers." *Id.* § 42-61.2-1(39).

39.    In 2019, the General Assembly further expanded the availability of sports betting in Rhode Island by authorizing "online sports wagering," defined as "engaging in the act of sports

9

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

wagering by the placing of wagers on sporting events or a combination of sporting events, or on the individual performance statistics of athletes in a sporting event or a combination of sporting events, over the internet through computers, mobile applications on mobile devices or other interactive devices approved by [RILOT]." *Id.*, § 42-61.2-1(27).

40.     Again, the General Assembly specified that "online sports wagering" would be subject to strict state control, including statutorily-imposed revenue sharing and geo-location requirements. Under § 42-61.2-5(a)(1), the state receives 51% of all in-person and online sports wagering revenues.  The servers that support "online sports wagering" must be physically located within a "restricted area" at Twin River, and any "online sports wagering" vendor must also "employ a mechanism to detect the physical location of a player at the time the player is wagering" to ensure he or she is located within Rhode Island.  *Id.*, § 42-61.2-16.

41.     Additionally, the General Assembly authorized RILOT to promulgate rules and regulations applicable to online sports wagering, *id.* § 42-61.2-3.3, and to "enter into contracts for the provision of server-based gaming systems, facilities, and related technology necessary or desirable for the state-operated online sports wagering," *id.* § 42-61.2-4(5).

42.     RILOT has since promulgated rules and regulations applicable to online sports wagering.[5]  These regulations impose on any online sports wagering "service provider" a host of additional requirements, including identity and age verification and "know your customer" (KYC) controls, monitoring and reporting of suspicious gambling activity, and responsible gaming protocols such as deposit limits, wager limits, time limits, and player self-exclusion.

---

[5] R.I. State Lottery Div., Rules and Regulations (Feb. 20, 2026), *available at* https://www.rilot.com/content/dam/interactive/ilottery/pdfs/about-us/RILotteryRules_2026.pdf.

10

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 84 of 105 PageID #: 170

43.    From 2019 until the present, RILOT has exclusively contracted with service provider International Game Technology (IGT) (in coordination with Twin River) for the delivery of "online sports wagering" in Rhode Island, through the technology platform called "Sportsbook Rhode Island®," which is available to Rhode Islanders in web browser and mobile app formats.

## KALSHI AND POLYMARKET FACILITATE GAMBLING IN RHODE ISLAND

### A.    Kalshi and Polymarket Offer "Event Contracts" on "Prediction Markets" to Rhode Islanders

44.    "Prediction markets" like the ones offered to Rhode Islanders by Kalshi and Polymarket allow users to place online wagers on the outcome of future events.  In this context, the wagers are in the form of so-called "event contracts" that users buy and sell (or "trade") on "prediction markets," based on the perceived likelihood of a given event occurring or not occurring.

45.    As Kalshi explains on its website, its platform "allows traders to buy and sell contracts on the outcomes of real-world events.  Whether you're interested in forecasting economic indicators, political outcomes, sports results, or cultural milestones, Kalshi is a regulated venue where you can put your predictions – and your money – where your mouth is."[6]

46.    Likewise, Polymarket, which advertises itself as "the world's largest predication market," states that its platform is "where people can bet on the outcome of future events.  By buying and selling shares in the outcomes, participants can collectively forecast the likelihood of events such as sports results, political elections, or entertainment awards."[7]

47.    Like gambling more generally, these prediction markets—and the speculative betting they facilitate—have grown like wildfire in the United States, consuming more and more

---

[6] https://news.kalshi.com/p/what-is-kalshi-f573
[7] https://help.polymarket.com/en/articles/13364272-what-is-a-prediction-market

11

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 85 of 105 PageID #: 171

of Americans' time, attention, and money.  One estimate holds that the industry expanded nearly 200-fold in 2025, hitting $44 billion in trade volume, and could reach a trillion dollars in annual volume by 2030.

48.     Kalshi and Polymarket dominate the present market for these platforms: of the approximately $44 billion in "prediction market" trade volume in 2025, Polymarket facilitated around $21.5 billion in trades, while Kalshi facilitated roughly $17.1 billion—together totaling around $38.6 billion, or 87%, of all prediction market trading.

49.     Kalshi and Polymarket allow users to place wagers on a broad, and seemingly ever-expanding, array of topics, ranging from local and national politics, to the prices of commodities like oil and gas and precious metals, to the outcome of professional, amateur, and collegiate sports matches.

50.     Kalshi and Polymarket explain that the pricing of "event contracts" is "dynamic" and reflective of the likelihood that the given event (the subject of the contract) occurs.

51.     According to Kalshi, "[t]hese event contracts work through a straightforward pricing system.  Each contract is priced between one cent and 99 cents, with the price reflecting the market's collective assessment of the probability that an event will occur.  For example, if a contract asking 'Will the government shut down by February 31?' is trading at 30 cents for 'Yes,' the market believes there's roughly a 30% chance of that outcome.  When you purchase a contract, you're essentially buying a position on a specific outcome.  If your prediction proves correct when the event resolves, each contract pays out one dollar.  If you bought a 'Yes' contract at 30 cents and the event occurs, you profit 70 cents per contract.  Conversely, if the event doesn't happen, you lose your initial stake."[8]

---

[8] https://news.kalshi.com/p/what-is-kalshi-f573

12

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 86 of 105 PageID
#: 172

52.     Polymarket similarly states that "Market Prices = Probabilities:  The price of shares in a prediction market represents the current probability of an event happening.  For example, if shares of an event are trading at 20 cents, it indicates a 20% chance of that event occurring . . . If the event occurs, each share becomes worth $1, yielding a profit."[9]

53.     Kalshi and Polymarket profit from the trading of these "event contracts" through the assessment of "transaction" or "trading" fees.

54.     Kalshi states that it "facilitates [the] transactions and generates revenue through small transaction fees on each trade,"[10] with its standard fee for "most markets" ranging from 0.07 cents to $1.75 per 100 contracts.[11]

55.     According to Polymarket, it also charges "trading fees," but only for "certain markets."  Whereas "geopolitical and world events" are "completely fee-free," Polymarket states, trading on sports-related events (referred to as "Polymarket Sports markets") are subject to a recently "updated fee structure with a peak effective fee of 0.75% at the 50/50 price point."[12]

**B.      Defendants' Sports-Related "Event Contracts" Allow Users to Place Wagers on Match Outcomes and the Performance of Individual Athletes**

56.     Kalshi and Polymarket offer event contracts on the outcomes of sports-related events across literally dozens of kinds of sports and similar activities, ranging (depending on the time of year) from basketball, baseball, soccer, and hockey, to chess, table tennis, and sumo wrestling.[13]

57.     Kalshi and Polymarket make available such sports-related "event contracts" to Rhode Islanders both online and through their mobile apps.

---

[9] https://help.polymarket.com/en/articles/13364272-what-is-a-prediction-market
[10] https://news.kalshi.com/p/what-is-kalshi-f573
[11] https://kalshi.com/fee-schedule
[12] https://help.polymarket.com/en/articles/13364478-trading-fees
[13] https://kalshi.com/category/sports/other; https://polymarket.com/sports/live

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 87 of 105 PageID #: 173

58.     The business of "trading" sports-related "event contracts" on "prediction markets" comes right at a time when sports betting has exploded in popularity in the United States.  By one recent estimate, nearly 50% of American men aged 18-49 years old have an active account with at least one online sportsbook.[14]

59.     It is no surprise, then, that sports have quickly come to dominate "trading" activity on Kalshi and Polymarket: in 2025, *the very first year* that Defendants offered sports-related wagering on their platforms, sports represented roughly 85% of Kalshi's trade volume, as well as 39% of Polymarket's total volume—more than any other "trading" category on its platform.[15]

60.     The growing prevalence and use of such "prediction markets" to wager on sports is especially concerning, given the well-documented harms associated with problem gambling, ranging from increased debt and financial pressures to extreme mental health risks and even suicide.

61.     Kalshi and Polymarket's sports-related "event contracts" allow bettors to wager on both the outcome of sports matches and the performance of individual players in those matches.

62.     For example, in connection with the NBA playoff matchup between the Philadelphia 76ers and the New York Knicks on May 6, 2026, Kalshi invited wagers (or "event contracts") on both the winning team as well as a number of individual player statistics (labeled "player props"):

---

[14] https://sri.siena.edu/2025/02/18/22-of-all-americans-half-of-men-18-49-have-active-online-sports-betting-account/
[15] https://keyrock.com/prediction-markets-the-next-frontier-of-financial-markets/.

14

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

## Kalshi - Match Outcome



Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

## Kalshi – Player Performance



Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

63.    Polymarket offered nearly identical wagers for the same May 6 matchup, using a

strikingly similar layout:

**Polymarket – Match Outcome**



Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 91 of 105 PageID #: 177

## Polymarket – Player Performance



**C.     Kalshi and Polymarket's Sports-Related "Event Contracts" Resemble Traditional Gambling in Myriad Other Ways**

64.     Beyond the basics of allowing bettors to place wagers on the outcomes of games and individual player performances, Kalshi and Polymarket's sports-related "event contracts" resemble traditional sports betting in other significant ways that make their products function, look, and feel even more like gambling.

65.     First, Kalshi and Polymarket each offer sports-related "event contracts" in forms that mimic traditional forms of sports betting.

66.     These include the "moneyline" (which team wins the game) and the "over under" (whether the final combined score in a game will be higher or lower than the set line)—both of which the General Assembly specifically referenced when first defining the term "sports wagering" under Rhode Island law in 2018, *see* R.I. Gen. Laws § 42-61.2-1(39).  They also include

18

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 92 of 105 PageID #: 178

the "point spread" (or "spread") (whether a team will win or lose by a certain number of points) as well as proposition (or "prop") bets (additional wagers that are independent of the outcome of the match, including individual player performances).

67. For example, in connection with the May 5, 2026 NBA playoff matchup between the Los Angeles Lakers and the Oklahoma City Thunder, Kalshi offered "event contracts" that were based on each of these traditional sports betting categories:

**Kalshi - Moneyline**



**Kalshi – Point Spread**



Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 93 of 105 PageID #: 179

**Kalshi – Over-Under**



**Kalshi – "Prop" Bets (Player Points)**

68.      Polymarket offered the same traditional sports bets for the Lakers-Thunder matchup on its own platform:

20

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 94 of 105 PageID #: 180

**Polymarket – Moneyline, Point Spread, Over-Under**



Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 95 of 105 PageID #: 181

**Polymarket – "Prop" Bets (Player Points)**



69.    These very same traditional sports bets on the Lakers-Thunder playoff matchup on May 5, 2026—the moneyline, point spread, over under, and a host of player "prop" bets—were also available to Rhode Island betters through the only state-operated, licensed, and approved online sports wagering platform, Sportsbook RI:

22

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 96 of 105 PageID #: 182

## Sportsbook RI – Moneyline, Point Spread, Over-Under



Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 97 of 105 PageID #: 183

**Sportsbook RI – "Prop" Bets (Player Points)**



70.    Of course, any such bets placed through Sportsbook RI were subject to all applicable Rhode Island laws, including statutorily required revenue sharing (under which the state retains 51% of sports-wagering and online sports-wagering revenues), as well as RILOT rules and regulations, including its responsible gambling requirements.

71.    Kalshi and Polymarket maintain that the very same wagers—if placed on their platforms in the form of "event contracts," rather than as bets on betting slips—do not constitute sports wagering.

24

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 98 of 105 PageID #: 184

72. Still other features of Defendants' platforms resemble traditional gambling and sports betting as well. For instance, Kalshi and Polymarket allow users to create accounts, deposit funds into those accounts, and use account funds to wager on "event contracts", much as one would purchase "chips" to place bets at Twin River, or place bets on the Sportsbook RI app. And any return on a successful wager will remain in a bettor's account on Kalshi or Polymarket until the bettor chooses to withdraw those funds—just as winnings from successful bets remain in a user's account until withdrawal on Sportsbook RI.

73. Additionally, Kalshi operates an affiliated entity that functions much like the "house" would in a classic gambling operation, by acting as a "market maker." Kalshi Trading LLC provides liquidity by placing both buy and sell orders for event contracts, ensuring that bettors can wager at nearly all times. By taking opposing positions, Kalshi Trading LLC absorbs imbalances in bettor demand and profits from price movements.

74. Likewise, Kalshi has an affiliated clearinghouse that finalizes and settles event contract wagers. Kalshi Klear LLC is responsible for determining outcomes, issuing payouts, and processing the movement of funds between bettors once an event has "resolved." It functions entirely within Kalshi's corporate structure and does not serve as an independent intermediary. This arrangement allows Kalshi to control each stage of the wager: Kalshi writes the rules for the contract, determines the basis for settlement, and oversees the payment process.

75. By using its own clearing agent, Kalshi reveals how such "prediction markets" are not merely third-party trading markets but rather closed-loop wagering operations that create the games, handle the bets, and pay the winners.

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00383-MSM-PAS    Document 13    Filed 05/27/26    Page 99 of 105 PageID #: 185

76.     By no coincidence, Kalshi and Polymarket employ additional design features that encourage impulsive engagement, exploit awards anticipation, and diminish users' perception of financial risk, via methods familiar in the gambling psychology literature.

77.     Kalshi, for example, bombards users with a constant flow of updates on what wagers other users are placing across the platform, a design mechanism known to trigger gambling behavior.  Kalshi users see a flurry of bets in a live ticker-tape stream displayed prominently on its homepage, alongside lists of "Trending" and "Top Movers" wagers.

78.     Likewise, when Kalshi users are ready to place their own bets, they are prompted to pursue other contracts that "people are also trading."

79.     Kalshi further displays leaderboard rankings based on profits and volume on a daily, weekly, monthly, and all-time basis in a manner that promotes high-risk behavior and rewards betting success with community recognition.  Certain leaderboards are time limited with a countdown clock to further increase pressure and encourage impulsive betting behaviors.

80.     Polymarket employs similar features on its platform.

81.     These updates, prompts, and leaderboards are all examples of mechanisms that behavioral scientists have long associated with addictive gambling behaviors, as observed with slot machines and other traditional gambling methods.

82.     There is only one conclusion to be drawn from these similarities: Kalshi and Polymarket function, look, and feel like gambling because they *are* gambling.  As such, they are rightly subject to Rhode Island's gambling laws.

**D.     Kalshi and Polymarket Have Described Their "Event Contracts" As "Bets"**

83.     Kalshi and Polymarket have even repeatedly made public statements referring to the sports-related "event contracts" on their platforms as "bets."

26

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

84.    Prior to April 2026, Kalshi constantly referred to itself in advertisements as a "sports betting platform" that offered "bets" on various real-world events.

85.    Kalshi's own "Press" page on its website still includes various news stories where Kalshi and its CEO refer to its offerings as "bets."[16]

86.    Kalshi has also argued in federal court that sports-related event contracts are "gaming," that "'gaming' (in the sense of betting on games) is a form of 'gambling,'" and that such activities belong in the same category as "casino gambling."  Appellee's Br. 41, 47, 50, *KalshiEx LLC v. Commodity Futures Trading Comm.*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024).

87.    Similarly, in past X (formerly Twitter) advertisements, Polymarket claimed that "[l]egal sports betting on the world's largest prediction market is coming to all 50 states."

88.    Polymarket has made similar statements elsewhere. For example, on its website, under the heading "What is Polymarket?," Polymarket says that it offers "betting on future events across various topics."[17]

89.    Likewise, on its website's FAQ page, Polymarket defines "a prediction market as a platform where people can *bet* on the outcome of future events."[18]

90.    User comments on Kalshi and Polymarket's sports-related "event contracts" frequently refer to the purchasing of such "event contracts" as "bets," revealing that Defendants' own customers, much like Defendants themselves, recognize that "trading" sports-related "event contracts" on "prediction markets" is simply another form of sports betting.

---

[16] https://news.kalshi.com/press
[17] https://help.polymarket.com/en/articles/13364060-what-is-polymarket
[18]   https://help.polymarket.com/en/articles/13364272-what-is-a-prediction-market   (emphasis added).

## KALSHI AND POLYMARKET ASSERT THAT THEY OPERATE LEGALLY IN R.I.

91.    Even though Kalshi and Polymarket operate completely independent of the state-run operations at Twin River, and outside of RILOT's regulation and control—in other words, in total defiance of Rhode Island's existing legal framework for permissible gambling in the state—Kalshi and Polymarket publicly maintain that their platforms are "legally" available to Rhode Islanders.

92.    This presents an actual controversy between the State and the Defendants that is ripe for adjudication under the Uniform Declaratory Judgments Act.

93.    For example, Kalshi has repeatedly and widely publicized the purported legality of its "event contracts" through its mobile app, website, social media, and other forms of advertising.

94.    Kalshi's "App Store" thumbnails (i.e., small images featuring the app) have made statements such as "legal in all 50 states."

95.    Kalshi's Instagram profile currently states that users can "[t]rade on anything in all 50 states: politics, sports, entertainment, crypto, weather, and so much more."

96.    Likewise, the KalshiSports Instagram profile currently reads, "[t]rade on anything in all 50 states: baseball, football, basketball, and so much more."

97.    On January 24, 2025, the KalshiNews blog announced the headline, "Game on: Kalshi brings 100% legal trading to all 50 states." [19]

98.    Polymarket has repeatedly made similar statements on its mobile app, website, social media, and other forms of advertising.

99.    For instance, a September 3, 2025, Polymarket advertisement on X claims that "Legal sports betting on the world's largest prediction market is coming to all 50 states."

---

[19] https://news.kalshi.com/p/game-on-kalshi-sports-trading-is-now-100-legal-in-all-50-states-2

28

100. In a Facebook advertisement around September 20, 2025, Polymarket claimed: "Polymarket is coming home," and that it "delivers the biggest payouts, instant cashout, and full access across all 50 states."

101. In similar Facebook advertisements in January and February 2026, Polymarket advertised that users can "Trade Legally in All 50 States."

102. Though Polymarket's website states that it is "not available to . . . persons located in the United States," users are able to access the U.S. version of Polymarket by signing up for an account through its mobile app. On its United States-based website, https://polymarket.com/usa, Polymarket advertises that "Polymarket is back" and offers users the chance to join a waitlist: "Polymarket's U.S. app is now being rolled out to those on the waitlist. Provide your phone number to secure your spot & be notified when it's your turn."

## KALSHI AND POLYMARKET'S SPORTS-RELATED "EVENT CONTRACTS" MEET RHODE ISLAND LEGAL DEFINITIONS FOR GAMBLING

103. Kalshi and Polymarket facilitate gambling (specifically sports wagering) in Rhode Island by allowing bettors to place wagers on the outcome of sports matches and individual player performances, under the guise of "trading" "event contracts" on "prediction markets."

104. These "event contracts" are, in all relevant respects, identical to the sports wagers that eligible Rhode Islanders may legally place either in person through the sportsbook at Twin River, or online through Sportsbook RI.

105. By facilitating the same kinds of sports wagering in Rhode Island on their platforms, Kalshi and Polymarket render themselves subject to Rhode Island's gambling laws and regulations.

106. Even though Defendants' sports-related "event contracts" amount to sports wagering, Defendants operate in Rhode Island outside of the State's control and in the absence of

29

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

the requisite voter approvals, in violation of Sections 15 and 22 of Article 6 of the Rhode Island Constitution.

107. Kalshi and Polymarket's sports-related "event contracts" likewise qualify as "casino gaming" as that term is defined in § 42-61.2-1(2). "Casino gaming" in Rhode Island includes any "game or device included within the definition of Class III gaming as that term is defined Section 2703(8) of Title 25 of the United States Code[.]" *Id.* As our Superior Court has already recognized, "sports wagering is a type of Class III gaming." *Harrop*, PC-2019-5273, 2020 WL 3033494, at *8 (citing 25 C.F.R. § 502.4).

108. Since the establishment of "casino gaming" in Rhode Island, the General Assembly has specified—and Rhode Island voters have repeatedly confirmed in state and local referenda— that all such "casino gaming" is limited to the state-run operations at Twin River, subject to RILOT's "full operational control." Kalshi and Polymarket currently offer sports wagering to Rhode Islanders entirely independent of Twin River and RILOT, defying Rhode Island law and the will of Rhode Island voters.

109. Likewise, by offering to Rhode Islanders sports-related "event contracts" on "prediction markets," Kalshi and Polymarket are engaged in "online sports wagering" under R.I. Gen. Laws § 42-61.2-1(27). Specifically, Kalshi and Polymarket facilitate "the act of sports wagering by the placing of wagers on sporting events" as well as "individual performance statistics of athletes in a sporting event, over the internet through computers" and "mobile applications on mobile devices[.]" *Id.*

110. But neither Kalshi nor Polymarket possesses a license or contract from RILOT to offer such "online sports wagering" to Rhode Islanders.

30

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

Case 1:26-cv-00333-MSM-PAS   Document 13   Filed 05/27/26   Page 104 of 105 PageID #: 190

111. Furthermore, by facilitating sports wagering in Rhode Island outside of the state's legal framework, and in the absence of a contract or license from RILOT, Kalshi and Polymarket are also in violation of R.I. Gen. Laws § 42-61.3-2(b)(18), among other state criminal laws that target unlawful gambling operations.

**PRAYER FOR RELIEF**

WHEREFORE, the State respectfully requests that the Court grant the following relief under its authority granted by the Uniform Declaratory Judgments Act, R.I. Gen. Laws § 9-30-1, *et seq.*:

112. Determine and declare, as a matter of law, that Defendants' offering of sports-related "event contracts" is subject to the constitutional requirements of R.I. Const. art. 6 §§ 15 and 22;

113. Determine and declare, as a matter of law, that Defendants' offering of sports-related "event contracts" constitutes "casino gaming" as defined by R.I. Gen. Laws § 42-61.2-1(2);

114. Determine and declare, as a matter of law, that Defendants' offering of sports "event contracts" constitutes "online sports wagering" as defined by R.I. Gen. Laws § 42-61.2-1(27);

115. Determine and declare, as a matter of law, that "casino gaming" and "online sports wagering" in the State of Rhode Island are restricted to the operations under the full operational control and regulation of RILOT, as set out in R.I. Gen. Laws §§ 42-61.2-2.1, -2.2, and -2.3;

116. Determine and declare, as a matter of law, that Defendants' operations in Rhode Island constitute unauthorized gambling in violation of R.I. Gen. Laws §§ 42-61.2-2.1, -2.2, and -2.3;

117. Permanently enjoin Defendants from offering sports-related "event contracts" on "prediction markets" within the State of Rhode Island;

118. Require restitution and disgorgement;

31

Case Number: PC-2026-02753
Filed in Providence/Bristol County Superior Court
Submitted: 5/21/2026 4:07 PM
Envelope: 5676805
Reviewer: J'Lyn D.

119.    Such other and further relief as this Court deems just and equitable in accordance with the facts of this case.

Dated: May 21, 2026                    Respectfully submitted,

                                       THE STATE OF RHODE ISLAND

                                       PETER F. NERONHA
                                       RHODE ISLAND ATTORNEY GENERAL

                                       By its attorneys:

                                       */s/ Patrick J. Dolan*
                                       */s/ Paul T.J. Meosky*
                                       */s/ Michael B. Collins*
                                       Patrick J. Dolan (#10462)
                                       Paul T.J. Meosky (#10742)
                                       Michael B. Collins (#11176)
                                       Special Assistant Attorneys General
                                       150 South Main Street
                                       Providence, RI 02903
                                       (401) 274-4400
                                       pdolan@riag.ri.gov
                                       pmeosky@riag.ri.gov
                                       mcollins@riag.ri.gov