**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| KALSHIEX, LLC,<br>　　　　　*Plaintiff,*<br><br>and<br><br>THE UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION,<br><br>　　　　　*Plaintiff-Intervenors,*<br><br>　　　　　v.<br><br>MARK FURCLO, et al.<br><br>　　　　　*Defendants.* | Case No.: 1:26-cv-00327-MSM-PAS<br><br><br><br><br>*Consolidated With*<br><br><br>Case No.: 1:26-cv-00333-MSM-PAS |
| THE STATE OF RHODE ISLAND,<br><br>　　　　　*Plaintiff,*<br><br>　　　　　v.<br><br>KALSHIEX LLC, and QCX LLC d/b/a POLYMARKET US,<br><br>　　　　　*Defendants.* | |

**BRIEF OF INDIAN GAMING ASSOCIATION, NATIONAL CONGRESS OF
AMERICAN INDIANS, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY
PROTECTION FUND, ARIZONA INDIAN GAMING ASSOCIATION, CALIFORNIA
NATIONS INDIAN GAMING ASSOCIATION, MINNESOTA INDIAN GAMING
ASSOCIATION, OKLAHOMA INDIAN GAMING ASSOCIATION, WASHINGTON
INDIAN GAMING ASSOCIATION, NATIONAL TRIBAL GAMING
COMMISSIONERS & REGULATORS, NATIVE AMERICAN FINANCE OFFICERS
ASSOCIATION, SAN MANUEL GAMING AND HOSPITALITY
AUTHORITY, AND 31 FEDERALLY RECOGNIZED
INDIAN TRIBES AS AMICI CURIAE
IN SUPPORT OF DEFENDANTS**

The Indian Gaming Association ("IGA"), National Congress of American Indians ("NCAI"), United South and Eastern Tribes Sovereignty Protection Fund ("USET SPF"), Arizona Indian Gaming Association ("AIGA"), California Nations Indian Gaming Association ("CNIGA"), Minnesota Indian Gaming Association ("MIGA"), Oklahoma Indian Gaming Association ("OIGA"), Washington Indian Gaming Association ("WIGA"), National Tribal Gaming Commissioners & Regulators ("NTGCR"), Native American Finance Officers Association ("NAFOA"), San Manuel Gaming and Hospitality Authority ("SMGHA"), and 31 federally recognized Indian tribes ("Amici Tribes")[1] (collectively, "Tribal Amici") respectfully submit this brief in support of Rhode Island's response to the Commodity Futures Trading Commission's ("CFTC"), KalshiEX LLC's ("Kalshi"), and QCX LLC's ("Polymarket") motions for preliminary injunction.

## INTRODUCTION

The CFTC, Kalshi, and Polymarket ask this Court to override the regulatory structure of sports betting in Rhode Island, abandon the long-standing national policy of state and tribal sports-betting regulation across the country, and turn decades of federal law on its head. The Court should not do so.

---

[1] The Amici Tribes include: Agua Caliente Band of Cahuilla Indians; Bay Mills Indian Community; Elk Valley Rancheria; Fond du Lac Band of Lake Superior Chippewa; Grand Traverse Band of Ottawa and Chippewa Indians; Hannahville Indian Community; Iowa Tribe of Oklahoma; Jamestown S'Klallam Tribe; Jamul Indian Village of California; Karuk Tribe; Kickapoo Traditional Tribe of Texas; Leech Lake Band of Ojibwe; Little Traverse Bay Bands of Odawa Indians; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Nottawaseppi Huron Band of the Potawatomi; Oneida Nation; Pechanga Band of Indians; Pueblo of Acoma; Pueblo of Sandia; Rincon Band of Luiseño Mission Indians; Santa Rosa Rancheria Tachi Yokut Tribe; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract); Spokane Tribe of the Spokane Reservation; Table Mountain Rancheria; Wilton Rancheria; Yavapai-Apache Nation; and Yuhaaviatam of San Manuel Nation.

Congress has unequivocally determined that all forms of class III gaming—including sports betting, 25 C.F.R. § 502.4—occurring on Indian lands are subject to regulation under the Indian Gaming Regulatory Act's ("IGRA") system of cooperative federalism, in which tribes, states, and the federal government each play a role in the oversight of such gaming. *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022). Critically, under this system, Congress expressly determined that "[c]lass III gaming activities shall be lawful on Indian lands *only if* such activities are[,]" among other things, "authorized by [tribal law and] … conducted in conformance with a Tribal-State compact." 25 U.S.C. § 2710(d)(1) (emphasis added). Yet the CFTC, Kalshi, and Polymarket argue that, without so much as a whisper of legislative intent, Congress gave Designated Contract Markets ("DCMs") like Kalshi and Polymarket, and other CFTC-registered platforms, permission to engage in sports-betting activity on tribes' Indian lands over such tribes' objections. Congress did no such thing.

When Congress enacted IGRA, it sought to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments[.]" 25 U.S.C. § 2702(1). IGRA has been incredibly successful on that front.[2] And since IGRA's passage in 1988, tribes across the United States have lifted entire generations out of poverty through tribal gaming. Gaming revenue supports thousands of jobs in hundreds of communities, and provides critical funding to tribal, state, and local governments through revenue-sharing agreements, taxes, and economic stimulus. In Rhode Island, sports betting is permitted, but only if operated by the State Lottery in accordance with state law. R.I. Gen. Laws § 42-61.2-2.4. While two casinos, operated by the State Lottery, operate any sports betting in the State, the State receives 51% of all sports betting revenue. This revenue goes into

---

[2] *See, e.g.*, Nat'l Indian Gaming Comm'n, FY 2023 Gross Gaming Revenue Report 4–5 (Jul. 2024), available at https://www.nigc.gov/wp-content/uploads/2025/02/GGR23_Final.pdf.

Rhode Island's General Fund, and is appropriated for various governmental purposes, including education, public safety, and healthcare.[3]

The Commodity Exchange Act ("CEA") does nothing to disturb IGRA's system of cooperative federalism. Since Congress enacted the CEA in 1922, tribal, federal, and state gaming regulation (including sports betting) has co-existed with federal derivatives market regulation harmoniously. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 360 (1982); *see also Ho-Chunk Nation v. Kalshi Inc.*, No. 3:25-cv-00698, 2026 WL 1284077, at *9–10 (W.D. Wis. May 11, 2026) (holding "the CEA is not a basis for dismissal of [tribe's] IGRA claim" seeking to enforce tribal law by prohibiting Kalshi from offering sports-betting contracts on its Indian lands). Their coexistence lies in the fact that, through the CEA, Congress merely sought to regulate derivatives "transactions … [that] provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information[,]" not gaming. 7 U.S.C. § 5(a).

The latest amendments to the CEA demonstrate that Congress intended to preserve this balance by, on the one hand, clarifying the CFTC's jurisdiction extends to derivatives transactions with legitimate hedging functions, such as grain futures, and on the other, preserving tribal and state regulation of gaming, including sports betting. *See* 7 U.S.C. §§ 1a(47)(A), 2(a)(1)(A), 7a-2(c)(5)(C). In 2010, in response to a devastating financial crisis driven by the trade of unregulated derivatives contracts (and at a time when federal law generally prohibited sports betting nationwide), Congress enacted the Dodd-Frank Act, in part, to extend the CFTC's jurisdiction over

---

[3] *See* Gaming Regulations & Statutory Requirements: Rhode Island, American Gaming Association, https://www.americangaming.org/wp-content/uploads/2026/03/Rhode-Island_Regulatory_Factsheet.pdf.

"swaps." *See* 7 U.S.C. § 2(a)(1)(A); *Murphy v. NCAA*, 584 U.S. 453, 461–62 (2018) (citing 28 U.S.C. § 3702). Through that same legislation and in an overt effort to prevent "gambling through supposed event contracts," including the listing of contracts "around sporting events such as the Super Bowl[,]" Congress further amended the CEA to include a Special Rule that expressly empowers the CFTC to prohibit contracts involving "gaming." *See* 156 Cong. Rec. S5906–07 (daily ed. Jul. 15, 2010) (statement of Sen. Lincoln); 7 U.S.C. § 7a-2(c)(5)(C). Pursuant to the Special Rule, and consistent with Congress's intent, the CFTC promulgated regulations, 17 C.F.R. § 40.11(a)(1), effecting a blanket prohibition on contracts involving "gaming." *See* Provisions Common to Registered Entities, 76 Fed. Reg. 44776, 44786 (Jul. 27, 2011).

The consequences of the CFTC, Kalshi, and Polymarket's arguments are difficult to overstate. Their reading of the CEA would amount to a *sub silentio* reversal of congressional policy and Supreme Court precedent; undermine existing tribal-state gaming compacts and regulatory frameworks; allow prediction markets to offer sports-betting contracts subject to their own private regulation—not state or tribal regulation—on state and tribal lands; permit prediction markets to divert gaming revenues away from tribal and state governments; and diminish tribal self-determination.

Accordingly, this Court should deny the CFTC, Kalshi, and Polymarket's motions for preliminary injunction.

**ARGUMENT**

I.    **Congress Did Not Impliedly Repeal IGRA or the Compacts.**

    A.    **IGRA's Structure**

In IGRA, Congress explicitly stated that no class III gaming can occur on "Indian lands" unless it is authorized by the tribal government and is in a state that permits such gaming. 25 U.S.C. § 2710(d). Class III gaming—including sports betting—is authorized on Indian lands only

4

where tribes and states have entered into a compact to regulate that gaming. 25 U.S.C. § 2710(d)(1); *see also* 25 C.F.R. § 502.4(c). The Secretary of the Interior must review and approve these agreements in order for lawful class III gaming to occur on tribal lands. 25 U.S.C. § 2710(d)(8). These core provisions have remained unchanged since 1988.

Under this regime, regulation of class III gaming on Indian lands is shared between tribes, states, and the federal government. Congress crafted this comprehensive regulatory regime to advance clearly-articulated policy goals to: (1) "promot[e] tribal economic development, self-sufficiency and strong tribal governments"; (2) "provide a statutory basis for regulation" that protects tribes' ability to be the primary beneficiary of gaming on their lands; and (3) create a federal regulatory agency to adopt federal standards and protect tribal gaming as a means of generating tribal revenue. 25 U.S.C. § 2702. Congress made it abundantly clear that tribes—not private entities—must benefit from any gaming conducted on their Indian lands. *See, e.g.*, 25 U.S.C. §§ 2710(b)(2)(A), (d)(2)(A). For many tribal governments, gaming is essential to their self-determination. *See Chicken Ranch Rancheria*, 42 F.4th at 1032.

Kalshi's and Polymarket's sports-betting activities—which the CFTC endorses and defends—fall squarely within IGRA's scope when they occur on Indians lands. *See* 25 C.F.R. § 502.4(c) (classifying sports betting as class III gaming). Under IGRA, however, Kalshi and Polymarket may not operate class III gaming activities, including sports betting, on Indian lands unless, among other things, their gaming activities are conducted in conformity with a tribal-state compact. *See* 25 U.S.C. § 2710(d)(1); 25 C.F.R. § 502.4(c).

Further, in a recently published proposed rule to amend its regulations, including 17 C.F.R. § 40.11(a), the CFTC acknowledged that "IGRA[] establishes a comprehensive federal framework for the regulation of gaming on Indian lands, that the National Indian Gaming Commission

administers that framework, and that Tribal-State compacts under section 11(d) of the IGRA govern the conduct of Class III gaming." Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35806, 35858 (Jun. 12, 2026). Despite this acknowledgment, the CFTC continues to draw a distinction without a difference over "event contracts traded as swaps or futures contracts" and class III gaming subject to IGRA. *Id.* at 35859. The plain truth, however, is that Kalshi and Polymarket are offering—and the CFTC is defending—activity that is unequivocally sports betting, which is class III gaming. 25 C.F.R. § 502.4(c).

> **B.  Congress Did Not Repeal IGRA When It Enacted the CEA's Definition of a "Swap" in 2010.**

The CFTC—as the regulatory authority overseeing Kalshi and Polymarket—has neither reviewed nor ensured that their sports betting activities on Indian lands comply with IGRA, despite their "self-certifications" that their activities comply with all federal law. *See Ho-Chunk Nation*, 2026 WL 1284077, at *10. Instead, the CFTC, Kalshi, and Polymarket argue that Congress's addition of a single term—"swaps"—within a statute whose entire purpose is to address the risk, discovery, and dissemination of commodity prices, 7 U.S.C. § 5(a)–(b), preempts the field of what is unequivocally sports betting. *See* Mem. of Law in Supp. of Proposed Pl.-Int.'s Mot. for Prelim. Inj. at 15–19, ECF No. 23-1, No. 1:26-cv-00327 (May 29, 2026) ("CFTC PI"); Pl.'s Mem. of Law in Supp. of Prelim. Inj. at 11–20, ECF No. 5-1, No. 1:26-cv-00327 (May 22, 2026) ("Kalshi PI"); Mot. for Prelim. Inj. at 3–5, ECF No. 26, No. 1:26-cv-00333 (Jun. 9, 2026) ("Polymarket PI"). Such an argument necessarily means that Congress intended to repeal core provisions of IGRA. Under this theory, Congress silently stripped away tribes' and states' longstanding authority over sports betting while allowing for-profit entities, like Kalshi and Polymarket, to run internet casinos pursuant to their own private oversight.

6

Contrary to what the CFTC, Kalshi, and Polymarket maintain now, if sports-betting contracts are "swaps" subject to the exclusive jurisdiction of the CFTC, then all sports betting—including sports betting conducted by tribes under IGRA—is governed by the CEA. *See KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1020 (D. Nev. 2025), *appeal filed*, No. 25-7516 (9th Cir. Nov. 25, 2025). As discussed below, the CFTC, Kalshi, and Polymarket's interpretation of "swaps" is so broad that it necessarily consumes all sports betting (and potentially other kinds of gaming). And with one inapplicable exception, the CEA prohibits off-market swaps. *See* 7 U.S.C. § 2(e). Consequently, if all sports-betting contracts are swaps, "then all sports betting must be done on a DCM." *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd. (Crypto.com)*, 815 F. Supp. 3d 1169, 1185 (D. Nev. 2025), *appeal filed*, No. 25-7187 (9th Cir. Nov. 13, 2025); *see also Ho-Chunk Nation*, 2026 WL 1284077, at *10 n.5.

The CFTC, Kalshi, and Polymarket's argument thus does double violence. First, by alleging Kalshi and Polymarket may offer sports betting nationwide, necessarily including on Indian lands, their argument sweeps aside Congress's recognition that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands." 25 U.S.C. § 2701(5). Second, it would prohibit tribes from offering sports betting that IGRA plainly authorizes. *See* 25 C.F.R. § 502.4(c).

Moreover, if the CFTC, Kalshi, and Polymarket's position is adopted, the reach of this definition would extend beyond sports betting to encompass other forms of gaming because their preemption argument depends on embracing an interpretation of "swap" that has "no limiting principle." *Hendrick*, 817 F. Supp. 3d at 1031; *Crypto.com*, 815 F. Supp. 3d at 1184; Opinion & Order at 13, *QCX LLC v. Nessel*, No. 1:26-cv-00710 (W.D. Mich. Jun. 17, 2026). The CFTC, Kalshi, and Polymarket's alleged definition of "an event or contingency associated with a potential

7

financial, economic, or commercial consequence" is so broad that it necessarily includes betting on other casino games.[4]  This means that virtually all gaming activity across the country must be offered on a DCM and regulated by the CFTC.  The irony of this result is that the gaming conducted pursuant to tribal-state gaming compacts or state law provides significantly more consumer protection than the type of unregulated sports betting offered by Kalshi and Polymarket and overseen by the CFTC, which generally allow users to engage in practically limitless betting with few, if any, guardrails.  *See KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004, at *10 n.9 (S.D. Ohio 2026), *appeal filed*, No. 26-3196 (6th Cir. Mar. 10, 2026).

Further, if the CEA governs Kalshi's and Polymarket's sports-betting contracts on Indian lands, then Congress must have intended to repeal key provisions of IGRA that expressly grant regulatory authority over such activity to tribes, states, and certain federal agencies.  *See* 25 U.S.C. §§ 2701(5), 2710(d); 18 U.S.C. § 1166(d).  Congress also must have intended to completely override the entire purpose and function of IGRA, which is to recognize tribal sovereignty to conduct and regulate gaming activity that occurs on Indian lands.  *See* 25 U.S.C. § 2701(5).  No amount of judicial gymnastics can turn the insertion of the term "swap" in the CEA into such a radical transformation of IGRA.

This Court should therefore reject the CFTC, Kalshi, and Polymarket's boundless interpretation of a "swap" and give effect to both IGRA and the CEA by excluding sports-betting contracts, such as those offered by Kalshi and Polymarket, from the CEA's definition of "swap."

---

[4] In fact, some companies are reportedly already using prediction market platforms to create slot machines.  *See* Jeff Edelstein, *It Seems the COO of Betr Just Built a Slot Machine on Kalshi*, InGame (Jun. 17, 2026), https://www.ingame.com/betr-coo-slot-kalshi/.  According to a post on X, Alex Ursa, the COO of Betr, stated that he built a slot machine "on top of [Kalshi's] APIs" by combining the purchase and sale of multiple contracts in a particular way.  *Id.*  Ursa's post on X also indicated that he built a roulette version the same way using Kalshi's platform.  *Id.*

In any event, such an interpretation is also more faithful to the CEA's statutory language and legislative intent.

> [I]t is our intent … [that the Special Rule] prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.

*See* 156 Cong. Rec. S5906–07 (daily ed. Jul. 15, 2010) (statement of Sen. Lincoln).

### C.    The CFTC, Kalshi, and Polymarket's Theory Does Not Meet the Standard for Implied Repeals.

The CFTC, Kalshi, and Polymarket's preemption argument, which relies on their overly broad interpretation of "swap," must be rejected because it would manufacture an implied repeal of IGRA where none exists. The CFTC, Kalshi, and Polymarket cannot meet the heavy burden of proving Congress intended to repeal IGRA because there is a reasonable interpretation of the CEA that gives full effect to both statutes: the CEA's definition of "swap"—and thus the CFTC's jurisdiction over such transactions—simply does not extend over sports betting (or other types of gaming under IGRA).

Courts apply the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citation modified). Congress's intent to repeal must be "clear and manifest." *Id.* "Congress does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Id.* at 515 (citation modified); *see also Morton v. Mancari*, 417 U.S. 535, 550 (1974).

9

Here, there is no "clear and manifest" congressional intent, and IGRA and the CEA can easily be harmonized by reading the CEA to exclude sports betting, consistent with longstanding CFTC regulations.

        *1.*     *Kalshi's and Polymarket's sports-betting contracts are not "swaps."*

As relevant here, the CEA defines "swap" as "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Kalshi's and Polymarket's sports-betting contracts simply do not fall under this definition and Congress therefore could not have intended to repeal IGRA.

First, looking at the plain language of the CEA, Kalshi's and Polymarket's sports-betting contracts are not dependent on the *occurrence*, *nonoccurrence, or extent of the occurrence* of a sports event—i.e., whether the sports event occurs—but rather on the *outcome* of the sports event (or parts thereof)—i.e., which team wins. Recently, the Nevada District Court held that sports bets are not swaps for precisely this reason. *Hendrick*, 817 F. Supp. 3d at 1023. The Southern District of Ohio also rejected the theory of Kalshi because "absurd results would flow from defining a 'swap' to include a sports-event contract." *Schuler*, No. 2:25-cv-1165-SDM-CMV, 2026 WL 657004, at *6. The Western District of Wisconsin similarly declined to read the CEA as impliedly repealing IGRA, in part, for this very reason. *See Ho-Chunk Nation*, 2026 WL 1284077, at *10 n.5.

Second, other courts have rejected a reading of the term "event" as used in 7 U.S.C. § 1a(47)(A)(ii) to mean (and therefore allow DCMs to offer wagers on) "essentially anything that happens" because "[t]here would be no difference between *event* and *occurrence*, and the statute's other inclusive definitions of *swap* would serve little to no purpose as they would be subsumed by

the all-encompassing *event* clause." *QCX LLC v. Nessel*, No. 1:26-cv-00710, 2026 WL 1166362, at \*2 (W.D. Mich. Mar. 10, 2026). As one court reasoned, the term "event" means "a happening 'of some sort of significance that took place or will take place, in a certain location, during a particular interval of time, *such as a particular sporting event*,'" but not "[i]ndividual actions and scores in individual sporting events." *Id.* (quoting *Crypto.com*, 815 F. Supp. 3d at 1183) (emphasis added).

Third, there is no "financial, commercial, or economic consequence" associated with Kalshi's or Polymarket's sports-betting contracts.[5] Aside from whether the purchaser wins or loses their bet, Kalshi's and Polymarket's sports-betting contracts have no direct financial consequences for the purchaser. To constitute a swap, the underlying event itself "must be inherently associated with a potential financial consequence." *Hendrick*, 817 F. Supp. 3d at 1030–31; *see also QCX LLC*, 2026 WL 1166362, at \*3 ("Reading *associated with* to require an inherent connection to those consequences rather than a downstream, attenuated consequence reins in the potential chains of association to infinity." (emphasis in original)). "[E]xternalities like whether people bet on the event or contingency, or whether the event's occurrence or nonoccurrence causes downstream financial consequences, are not sufficient." *Hendrick*, 817 F. Supp. 3d at 1028; *see also QCX LLC*, 2026 WL 1166362, at \*3. Without this limiting principle, *everything* would constitute a swap,

---

[5] Holding sports-betting contracts meets this bar would defy rationality because, as acknowledged by Judge Roth in her dissent in *KalshiEX, LLC v. Flaherty*, "Kalshi's proffered definition [of 'swap'] would likely encompass virtually every kind of wager that could exist, including classic casino games and charity raffles," and "any individual who engages in gambling outside of a DCM would commit a felony were we to take the definition of swaps to its logical extreme. No. 25-1922, 2026 WL 924004, at \*8 (3d Cir. 2026) (Roth, J., dissenting). After all, even a bet over the outcome of a friendly neighborhood ping pong match may have a '*potential* financial ... consequence' because one of the bettors would reap a financial reward based on the match's outcome." *Id.* (emphasis in original). Clearly, "Congress could not have intended for such a rationality-defying outcome." *Id.*

11

which is clearly an absurd result contrary to Congress's intent.  As the Western District of

Michigan recently held,

> *Anything* can potentially have economic ramifications given enough attenuation and happenstance.  Granted, the word "associated" *can* include the most remote of attenuated connections-upon-connections.  But as the Supreme Court explained when interpreting the similar language of "relate to," reading the text "to extend to the furthest stretch of its indeterminacy" would "be to read Congress's words of limitation as a mere sham" because "really, universally, relations stop nowhere."  The Court rejected the idea that the provision at issue could imply chains of "infinite relations" or "infinite connections" and concluded that it had to "go beyond the unhelpful text and the frustrating difficulty of defining its key term" and "look instead to the objectives" of the statute "as a guide to [its] scope."

Opinion and Order at 6, *QCX LLC*, No. 1:26-cv-00710 (quoting *N.Y. State Conf. of Blue Cross &*

*Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655–56 (1995)).  In the CEA, Congress

defined the term "swap" in a particular context.  "If that context is ignored, the definition of the

term 'swap' becomes so broad that it sweeps in any agreement or transaction dependent on

anything happening that could conceivably result in any degree of financial consequence for

anyone.  This would intrude not only on the province of state gambling law but also on contract

law (service contracts), property law (mortgages), and family law (prenuptial agreements), among

others." *Id.* at 14.

Kalshi's and Polymarket's sports-betting contracts do not satisfy this requirement and

therefore do not qualify as swaps.

> 2.     *Congress did not manifest clear intent to repeal IGRA or to make the CFTC a gaming regulator.*

Congress did not repeal key aspects of IGRA and grant the CFTC the exclusive authority

to regulate nationwide sports betting.  In fact, Congress expressed the opposite intent and went out

of its way to prevent event-contract markets from being used to conduct gambling.  *See* 156 Cong.

Rec. S5906-07 (daily ed. Jul. 15, 2010) (colloquy between Sens. Feinstein and Lincoln). Specifically, Congress enacted the "Special Rule" authorizing the CFTC to "determine that such agreements, contracts, or transactions are contrary to the public interest" and to *disallow* any "gaming" activity on DCMs at all. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii). The CFTC acted consistently with Congress's intent by promulgating its blanket prohibition of event contracts involving gaming. 17 C.F.R. § 40.11(a)(1). In promulgating its rule, the CFTC explained that its "prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" 76 Fed. Reg. at 44786 (citation modified). Thus, the CFTC recognized that the Special Rule reinforced Congress's existing policy *against* sports betting.

Kalshi has even acknowledged this fact in a brief filed with the D.C. Circuit, stating: "An event contract thus involves 'gaming' if it is contingent on a game or game-related event. The classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, *Congress did not want sports betting to be conducted on derivatives markets*." *See* Appellee Br. at 41, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024) (citation omitted, emphasis added). The Special Rule and the CFTC's regulations undermine any claim that Congress intended to repeal IGRA and legalize sports betting. That the CEA and IGRA overlap here is due only to the CFTC, Kalshi, and Polymarket's misguided arguments and their backdoor attempt to evade comprehensive gaming regulations.[6]

---

[6] Under the CFTC, Kalshi, and Polymarket's theory, prediction markets can simply call a sports wager a "swap"—regardless of whether it is actually a valid "swap"—and list it for trade on a DCM, which automatically grants the CFTC exclusive jurisdiction, to the detriment of all other regulatory authorities. *See* CFTC PI at 7; Kalshi PI at 6, 18; Polymarket PI at 2. What, then, would prevent Kalshi or Polymarket from calling "contracts" on other traditional forms of gaming, like roulette and lotteries, "swaps" and subjecting them to the exclusive jurisdiction of the CFTC? According to Kalshi, CFTC inaction—despite banning "gaming" contracts via 17 C.F.R.

13

Furthermore, the text and legislative history of the 2010 CEA amendments confirm that the CFTC was not established to regulate sports betting, let alone assume the role of the nation's sole sports-betting regulator. And, historically, the CFTC likewise did not assert such authority itself, despite its current attempts to backtrack. *See* Event Contracts, 89 Fed. Reg. 48968, 48982–83 (Jun. 10, 2024) ("The [CFTC] is not a gaming regulator … and the [CFTC] does not believe that it has the statutory mandate nor specialized experience appropriate to oversee [gambling], or that Congress intended for the [CFTC] to exercise its jurisdiction or expend its resources in this manner.").

Strikingly, the CFTC has even previously acknowledged that "Rule 40.11 implements the Special Rule by *prohibiting DCMs from offering event contracts that involve[], relate[] to, or reference[] … gaming*." Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. at 15–16, ECF No. 35, *CFTC v. State of New York*, No. 1:26-cv-03404 (S.D.N.Y. May 1, 2026) (emphasis added). But despite this, the CFTC fails to acknowledge that (1) it is now directly defending the very sports-betting contracts (contracts that involve gaming) it notes are prohibited, and (2) the preemption argument it advances necessarily means Congress impliedly repealed key aspects of IGRA and other applicable federal laws without any expression of intent to do so. But this Court need not give deference to the CFTC's position here because the power to interpret statutes

---

§ 40.11(a)(1)—is all that is required to bless illegal event contracts blatantly designed for no other purpose than to enable gambling. But "[b]ecause the definition of swap cannot turn on whether the transaction occurred on a [DCM], the definition either produces the absurd result of forcing broad swaths of ordinary transactions onto [DCMs] through § 2(e), or it does not, and [their] preemption theory falls apart because excluding those other ordinary transactions excludes [Kalshi's and Polymarket's] sports betting products as well." Opinion and Order at 21, *QCX, LLC*, No. 1:26-cv-00710.

ultimately belongs to the courts, not the CFTC. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385–86 (2024).

This Court should reject the CFTC, Kalshi, and Polymarket's efforts to expand the CFTC's jurisdiction to a vast new area of regulation.

> 3.    *The Indian Canons of Construction require this Court to resolve any ambiguity in favor of tribes.*

Even if there were ambiguity as to whether Congress intended to partially repeal IGRA when it amended the CEA in 2010 (there is not), the Indian Canons of Construction require courts to resolve statutory ambiguities in favor of tribes. *See, e.g.*, *Bryan v. Itasca Cnty.*, 426 U.S. 373, 392 (1976); *see also Penobscot Nation v. Frey*, 3 F.4th 484, 503 (1st Cir. 2021); *Ho-Chunk Nation*, 2026 WL 1284077, at *7. Federal courts have consistently applied these canons to ensure that later-enacted statutes of general applicability cannot repeal earlier-enacted legislation specifically designed to advance the United States' special relationship with tribes, without a clear statement from Congress. *See, e.g.*, *Mancari*, 417 U.S. at 550–51; *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1159–60 (9th Cir. 2020).

This Court should therefore reject the CFTC, Kalshi, and Polymarket's preemption argument requiring an implied repeal of IGRA.

## II.    The Major Questions Doctrine Forecloses the CFTC, Kalshi, and Polymarket's Theory.

In 2010, federal law—namely, the Professional and Amateur Sports Protection Act ("PASPA")—largely prohibited sports betting nationwide. The CFTC, Kalshi, and Polymarket's position thus requires interpreting the CEA not only to eradicate state and federal gaming laws by preemption or implied repeal, but also to reverse the federal policy that, at the time, prohibited

sports betting—turning it instead into a nationwide authorization of such betting under the jurisdiction of the CFTC.[7]  Whether Congress did so is a major question.

Under the Major Questions Doctrine, courts have "reason to hesitate before concluding that Congress meant to confer" agency authority in cases where the agency has asserted a "breadth" of authority over matters of "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).  In such cases, considering "both separation of powers principles and a practical understanding of legislative intent," there must be "clear congressional authorization." *Id.* at 723 (citation modified).  Further, "Congress [does not] typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *Id.* (citation modified)); *see also Learning Res. v. Trump*, 146 S. Ct. 628, 642 (2026).

In effect, the CFTC, Kalshi, and Polymarket contend that the 2010 CEA amendments displaced state and tribal gaming regulations, undermined tribal-state gaming compacts, legalized sports betting nationwide, and placed sports betting under the regulatory jurisdiction of the CFTC, all at a time when federal law broadly prohibited sports betting.  This is unquestionably a "radical" and "fundamental" overhaul to both PASPA and IGRA, and certainly raises concerns of "economic and political significance." *West Virginia*, 597 U.S. at 721, 723.  This Court therefore has significant "reason to hesitate" and should require "clear congressional authorization" before even considering the CFTC, Kalshi, and Polymarket's preemption argument. *Id.* at 721, 724.[8]

---

[7] Kalshi's and Polymarket's sports-betting contracts also violate other federal laws, including the Wire Act, 18 U.S.C. § 1084, the Illegal Gambling Business Act, 18 U.S.C. § 1955, and the Travel Act, 18 U.S.C. § 1952(a).  If Congress authorized sports betting via the CEA in 2010, then it also effectively limited the scope of these federal laws.

[8] The Supreme Court has also held that "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism.  We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'"

First, Congress must be clear when it "alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001). Here, gaming regulation, and even sports-betting regulation specifically, has been understood to be within traditional state power. *See Murphy*, 584 U.S. at 474, 481–85; *see also Artichoke Joe's Ca. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) ("[T]he regulation of gambling lies at the heart of the state's police power." (citation modified)). As the Supreme Court noted in *Murphy*, Congress has long structured federal criminal law to "respect the policy choices of the people of each State on the controversial issue of gambling." 584 U.S. at 484; *see also Chicken Ranch*, 42 F.4th at 1032 (IGRA "strike[s] a delicate balance" between tribal and state sovereignty over gaming). And even when Congress chose to prohibit sports betting nationally through PASPA, it did so *through* state regulation, rather than by directly regulating private actors. *See Murphy*, 584 U.S. at 484–85.

Similarly, courts have long recognized tribes' inherent sovereign authority to regulate gaming on their lands. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207–14 (1987). Though it imposes limited restrictions on this authority, IGRA still broadly advances tribes' "exclusive right to regulate [and offer] gaming activity" (including sports betting) on their Indian lands as a means of promoting tribal economic development and self-determination. *See*

---

*Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000))). Here, the CFTC and Kalshi assert that the CFTC's exclusive jurisdiction over its sports-betting contracts derives from such a "long-extant statute." Specifically, they claim that the CFTC's exclusive jurisdiction over Kalshi's and Polymarket's sports-betting contracts, and thus its preemptive authority over state (and, by extension, tribal and even other federal) gaming regulation, extends not only from the 2010 CEA amendments and the addition of the term "swap," but from as far back as the 1974 amendments to the CEA. *See* CFTC PI at 18–20, 25; Kalshi PI at 2, 4–5, 20. Despite what the CFTC, Kalshi, and Polymarket may claim, neither the 1974 nor 2010 CEA amendments "speak clearly" to a congressional intent to repeal key provisions of IGRA or to make the CFTC a gaming regulator.

17

25 U.S.C. §§ 2701(5), 2702(2); *W. Flagler Assocs. v. Haaland*, 71 F.4th 1059, 1062–63 (D.C. Cir 2023), *cert denied*, 144 S. Ct. 10 (2024). And later-enacted statutes of general applicability—like the CEA—cannot repeal earlier-enacted legislation that is specifically designed to advance the United States' special relationship with tribes—like IGRA—without a clear statement from Congress. *See, e.g., Mancari*, 417 U.S. at 550.

Accordingly, because regulating gaming (including sports betting) has long been a traditional state and tribal power, the CFTC, Kalshi, and Polymarket must show clear congressional language overturning that federal policy. But they cannot because no such language exists. *See KalshiEX, LLC. v. Schuler*, No. 26-3196, 2026 WL 1295806, at *5–6 (6th Cir. Apr. 24, 2026) (rejecting argument that the CEA likely preempts state gaming laws, in part, because the CEA has numerous savings clauses preserving states' authority to regulate aspects of derivatives markets and Kalshi could not otherwise prove that it was "the clear and manifest purpose of Congress" to "preempt Ohio's 'historic police powers.'" (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009))); *see also Ho-Chunk Nation*, 2026 WL 1284077, at *9–10 (holding that Congress does not "repeal[] its own laws 'by implication,' nor abrogate tribal sovereign authority without expressly and unequivocally saying it is doing so" and, as such, the "CEA is not a basis for dismissal of [tribe's] IGRA claim" against Kalshi). Rather, the CEA *reinforces* the federal policy in favor of state gaming regulation by disclaiming preemption of state gaming laws. *See* 7 U.S.C. § 16(e). And nothing in the definition of "swap" indicates that Congress meant to overturn the entire field of sports-betting regulation or Indian gaming.

Second, sports betting has a "unique place in American history and society," and therefore its own "political history." *Cf. Brown & Williamson*, 529 U.S. at 159–60. Given this social and political history, at the time of the 2010 CEA amendments, Congress had already "for better or for

18

worse, … created a distinct regulatory scheme" for sports betting—namely, PASPA. *Cf. id.* The conflict between the CFTC, Kalshi, and Polymarket's argument and the existence of PASPA's nationwide sports-betting prohibition in 2010 therefore indicates that Congress could not have intended to regulate sports betting in the way that they now claim. "Given this history and the breadth of the authority that [the CFTC] has asserted [it has]," this Court should not defer to the CFTC, Kalshi, and Polymarket's "expansive construction" of the CEA. *Cf. id.* at 160.

The Supreme Court eliminated PASPA as a barrier to sports betting in 2018 when it held PASPA unconstitutional. *See Murphy*, 584 U.S. at 486. Since then, several states have established regulatory schemes for sports betting under their traditional police powers. But that has no bearing on whether Congress's CEA amendments *in 2010* had the effect of obliterating PASPA (and IGRA), and the state laws on which it relied. In holding PASPA unconstitutional, the Supreme Court made no suggestion that Congress had *already* preempted all state gaming laws eight years earlier. *Id.* at 479–80. To the contrary, the majority opinion concluded with an observation incompatible with the CFTC, Kalshi, and Polymarket's arguments: "The legalization of sports gambling requires an important policy choice, but the choice is not ours to make. Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Id.* at 486. In other words, the CFTC, Kalshi, and Polymarket's deregulatory elephant was hidden in a statutory mousehole far too small for the Supreme Court to notice when deciding whether sports betting would be legal.[9]

---

[9] And if sports-event contracts are indeed swaps that must be traded on DCMs, this would "have a seismic impact on Indian tribes' authority to regulate gaming on tribal land." *See Schuler*, 2026 WL 657004, at *6 n.6; *see also Ho-Chunk Nation*, 2026 WL 1284077, at *10 (same).

Ignoring history and context, the CFTC, Kalshi, and Polymarket present an alternate reality in which a statutory scheme whose scope is limited to addressing the risk, discovery, and dissemination of commodity pricing information, *see* 7 U.S.C. § 5(a)–(b), governs nationwide sports betting. In their view, Congress repealed the comprehensive regulatory scheme set forth in IGRA, similar structures set up by state law and the then-federal policy requiring states to prohibit sports betting, as codified in PASPA. And the CFTC, Kalshi, and Polymarket argue all of this happened without even a whisper of legislative intent.

The CFTC, Kalshi, and Polymarket's position cannot withstand even the slightest scrutiny. As the Nevada District Court aptly stated: "It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010." *Hendrick*, 817 F. Supp. 3d at 1031–32.

## III. The CFTC, Kalshi, and Polymarket's Preemption Argument Would Violate the Private Nondelegation Doctrine.

The CFTC, Kalshi, and Polymarket's preemption argument turns on the extraordinary claim that Congress delegated the power to preempt state law to Kalshi and Polymarket— interested private parties—simply by self-certifying their own sports-betting contracts and listing them on their exchanges. The private non-delegation doctrine, however, guards against precisely the type of unchecked, privately exercised power upon which this argument relies. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

While the Supreme Court upholds congressional delegations of power to federal agencies with an intelligible principle, it applies a different standard when those delegations are to private entities. "[A] law … violates the private nondelegation doctrine when it allows non-governmental entities to govern." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 697 (2025).

20

Recently, the Supreme Court found that the permissibility of a private delegation depends on whether the agency retains oversight and ultimate decision-making authority over the private entity's actions. *Id.* at 693. There, the Court upheld the delegation to a private entity, but only because it merely played "an advisory role" and the final decision-making authority rested with the agency. *Id.*

In contrast, under the CFTC, Kalshi, and Polymarket's theory—and indeed, the CFTC's own implementation of the CEA—the CEA's self-certification provisions empower DCMs like Kalshi and Polymarket (private, for-profit entities) to oversee their own sports-betting enterprises, yet simultaneously fail to provide any mechanism for advance public comment, mandatory agency oversight, or standards by which the CFTC may implement its discretion.[10] In fact, the CFTC itself has seemingly abrogated its own enforcement authority by not only refusing to check Kalshi's or Polymarket's clearly unlawful activity, but going so far as to advance affirmative litigation against states to defend it.

Further, even according to the CFTC, DCMs' self-certifications are not merely advisory. Rather, they have the force of law and CFTC inaction is sufficient to trigger preemption. "The result of this regulatory scheme is that [Kalshi or Polymarket] can, without any [CFTC] review of its decision on the merits, effectively decide" to offer sports betting free from tribal and state regulation. *Cf. Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1328 (D.C. Cir. 2024). Consequently, construing the CEA to attribute legal effect on state law via Kalshi's or Polymarket's self-certification would be unconstitutional—a construction that must be avoided.

---

[10] *See* Farewell Address of Commissioner Kristin N. Johnson, CFTC (Sep. 3, 2025), https://www.cftc.gov/PressRoom/SpeechesTestimony/opajohnson25?utm_source=substack&utm_medium=email (warning that the CFTC has "too few guardrails and too little visibility into the prediction market landscape").

*See United States v. Kozeny*, 541 F.3d 166, 176 (2d Cir. 2008) ("[W]here a statute is susceptible of two constructions, by one which grave and doubtful constitutional questions arise and by the other of which questions are avoided, our duty is to adopt the latter." (citation modified)).

Moreover, Kalshi and Polymarket have a financial interest in self-certifying their own sports-betting contracts, regardless of such certifications' verity. And this financial interest is directly adverse to the sovereign and economic interests of tribes. The effects of Kalshi's and Polymarket's self-certification go even further; in the CFTC, Kalshi, and Polymarket's view, Kalshi and Polymarket can block tribes and states from regulating that which has long been within their sovereign authority to regulate simply by listing sports-betting contracts on their exchanges. *See* CFTC PI at 7; Kalshi PI at 6, 18; Polymarket PI at 2. As the Supreme Court has stated, "[t]his is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter Coal*, 298 U.S. at 311.

## CONCLUSION

For the foregoing reasons, the Tribal Amici respectfully request that the Court deny the CFTC, Kalshi, and Polymarket's motions for preliminary injunction.

22

DATED: June 25, 2026

Respectfully submitted,

/s/ Dana M. Horton
Dana M. Horton (RI Bar #6251)
**ROBINSON & COLE LLP**
One Financial Plaza
14th Floor
Providence, RI 02903
Direct 401.709.3352
Email: dhorton@rc.com

*Counsel for Tribal Amici*

Joseph H. Webster (*pro hac vice* pending)
Elizabeth A. Bower (*pro hac vice* pending)
Jens W. Camp (*pro hac vice* pending)
Alexandra K. Holden (*pro hac vice* pending)
**HOBBS, STRAUS, DEAN & WALKER LLP**
1899 L Street NW, Suite 1200
Washington, DC 20036
Telephone: (202) 822-8282
Email: jwebster@hobbsstraus.com
        ebower@hobbsstraus.com
        jcamp@hobbsstraus.com
        aholden@hobbsstraus.com

*Counsel for Tribal Amici*

Scott Crowell (*pro hac vice* pending)
**CROWELL LAW OFFICE**
TRIBAL ADVOCACY GROUP PLLC
1487 W State Rte 89A, Suite 8
Sedona, AZ 86336
Telephone: (425) 802-5369
Email: scottcrowell@clotag.net

*Counsel for Rincon Band of Luiseño Indians, Santa Ynez Band of Chumash Mission Indians, and Spokane Tribe of the Spokane Reservation*

Bryan Newland (*pro hac vice* pending)
**POWERS, PYLES, SUTTER & VERVILLE PC**
1250 Connecticut Ave N, 8th Floor
Washington, DC 20036
Telephone: (202) 349-4265
Email: Bryan.Newland@powerslaw.com

*Counsel for Bay Mills Indian Community, Mohegan Tribe of Indians of Connecticut, Rincon Band of Luiseño Indians, and Santa Ynez Band of Chumash Mission Indians*

Michael Hoenig (*pro hac vice* pending)
**YUHAAVIATAM OF SAN MANUEL NATION**
422 1st Street SE
Washington, DC 20003
Telephone: (909) 936-9684
Email: Michael.Hoenig@sanmanuel-nsn.gov

*Counsel for Yuhaaviatam of San Manuel Nation and San Manuel Gaming and Hospitality Authority*

23

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2026, I electronically filed the foregoing document with the Clerk for the United States District Court for the District of Rhode Island using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

DATED:  June 25, 2026

*/s/ Dana M. Horton*
Dana M. Horton (RI Bar #6251)